In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 05-3409

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOHN E. EWING, JR.,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Central District of Illinois.
No. 02 CR 20008—**Michael P. McCuskey**, *Chief Judge.*

---

ARGUED SEPTEMBER 15, 2006—DECIDED JULY 17, 2007

---

Before FLAUM, KANNE, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* John Ewing, Jr., is a paranoid schizophrenic plagued by delusions that society is engaged in a conspiracy to read his thoughts. After becoming convinced a state court judge was part of that conspiracy, Ewing attacked the judge with a Molotov cocktail. For this he was indicted on two federal charges and at trial raised a defense under the federal insanity statute, 18 U.S.C. § 17(a), which provides that a defendant has an affirmative defense if "as a result of a severe mental disease or defect, [he] was unable to appreciate the nature and quality or the wrongfulness of his acts."

Ewing asked the district court to instruct the jury that "wrongfulness" for purposes of the insanity defense means

"moral as well as criminal wrongfulness," and further that "moral wrongfulness" is determined according to the defendant's subjective beliefs about morality or moral justification. The district court denied this request and instead adopted the government's alternative instruction that defined wrongfulness as "contrary to public morality, as well as contrary to law." The jury rejected Ewing's insanity defense and found him guilty. Ewing now appeals, challenging the district court's refusal to give his jury instruction on wrongfulness as well as the court's failure to order sua sponte competency hearings at various points during the proceedings.

We affirm. The district court provided the jury with a proper instruction on the meaning of wrongfulness for purpose of the insanity defense. A defendant's ability to appreciate the wrongfulness of his acts is a concept adopted from the common-law *M'Naghten* rule for legally exculpatory insanity. *M'Naghten's Case* and American case law applying it establish that a defendant's ability to appreciate right and wrong has consistently been determined by reference to societal, not personal, standards of morality. Finding no language in the statute to the contrary, we infer that Congress adopted *M'Naghten*'s conception of wrongfulness when it codified the essential elements of the *M'Naghten* insanity test in § 17(a). We also conclude the district court did not err in failing to order a competency hearing during trial or a retrospective competency hearing after trial.

## I. Background

### A. The Attack on Judge Miller

Ewing has a history of paranoid schizophrenia dating back at least twenty years. During that time, he has intermittently taken medication and resided at various

mental health facilities. A recurring symptom of his mental illness is a delusion that society is engaged in an elaborate conspiracy to read his thoughts through the aid of supercomputers. Ewing also persists in believing he was awarded a $25 million judgment by consent decree in a slip-and-fall civil lawsuit he filed in 1988 against a grocery store in Champaign, Illinois. In reality, that lawsuit was dismissed on summary judgment by Judge George Miller of the Champaign County Circuit Court.

After numerous unsuccessful written attempts to convince Judge Miller that he was owed $25 million, Ewing decided to attack the judge with a Molotov cocktail. At the time Ewing was living in a nonrestrictive mental health community in Peoria and was off his medication. On April 8, 1997, Ewing traveled by bus to Champaign. Once he arrived, he purchased and filled a gas can at a gas station near the Champaign County courthouse, then purchased a 40-ounce bottle of malt liquor from a nearby liquor store and a knife from a local pawn shop. He next checked into a motel, where he used these materials to prepare a Molotov cocktail. From there he walked to the courthouse, entered Judge Miller's courtroom with a hood up around his face, threw the device at the judge, and fled. Judge Miller ducked to avoid the firebomb, sustaining a head laceration. The incendiary device fell at the foot of the judge's bench, the bench caught fire, and the courtroom was engulfed in flames. At the time of the attack, Judge Miller was presiding over a civil trial. The jurors, litigants, and courtroom personnel escaped the burning courtroom in a panic; no one was seriously injured. Firefighters responded and suppressed the fire, but everything in the courtroom was destroyed.

After the attack Ewing ran out of the courthouse and threw his hooded jacket under a van. He stopped at a local library for a while and then returned to his motel room. Meanwhile, the police found the jacket under the van and

the gas can in a dumpster at the motel where Ewing was staying. After putting the motel under surveillance, the officers confronted Ewing leaving his room and noted that he smelled of gasoline. Ewing was arrested, and the officers found the knife and a note stating "G.S. Miller" and the judge's office telephone number on Ewing's person. A search of Ewing's motel room turned up further evidence of the crime. Ewing was taken to the sheriff's office, where he refused to admit to the attack.

## B. Pretrial Competency Proceedings

Two days after his arrest, Ewing was committed to the custody of the Attorney General for a competency determination in accordance with 18 U.S.C. § 4241(a). After an examination by Dr. David F. Mrad, Ewing was found incompetent to stand trial and committed for treatment, which continued for approximately five years. On January 18, 2002, Dr. Mrad reported that Ewing was now competent to stand trial. Ewing was then indicted on charges of arson in violation of 18 U.S.C. § 844(i) and use of a destructive device during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A) and (B)(ii). On May 10, 2002, the district court found that Ewing was competent to stand trial. Shortly thereafter, the defense gave notice of its intention to proceed with an insanity defense.

Ewing was subsequently reexamined by both Dr. Mrad and Dr. Robert Chapman, Ewing's expert. Dr. Chapman questioned Ewing's competency, and the district court granted the defense's motion for another competency hearing. On May 27, 2003, Dr. Mrad issued another report concluding that Ewing was competent to stand trial; the court accepted this determination and set a trial date of April 14, 2004. Following a brief continuance, jury selection commenced on May 24, 2004. One day into jury selection, the court granted a mistrial based on tainting

of the jury pool by pretrial publicity about the incident. The trial was moved to Rock Island, Illinois, and rescheduled for September 13, 2004.

On August 30, 2004, the defense filed a motion for another competency hearing based on some additional delusional behavior Ewing had recently exhibited. Dr. Mrad immediately examined Ewing again and on September 8 informed the court that although Ewing was not doing as well as in 2003, he remained minimally competent to stand trial. In his report Dr. Mrad stated that although some of Ewing's delusions persisted, they did not render Ewing incapable of understanding the proceedings against him or participating in his defense. The court accepted Dr. Mrad's opinion and found Ewing competent to stand trial, but noted the doctor's caution that Ewing's behavior should be monitored during trial. Dr. Mrad had also reported that a change in Ewing's medication may have contributed to his decline in competency, so Ewing was returned to the medication regimen he had been taking in 2003. The marshals ensured Ewing was taking his medication during the trial, and Dr. Mrad and Dr. Chapman were available to observe his conduct throughout.

## C. Pretrial and Trial Proceedings

Ewing asserted a defense based on the federal insanity statute, which provides:

> (a) **Affirmative defense.** It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.

(b) **Burden of proof.** The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

18 U.S.C. § 17. Prior to trial the defense submitted a nonpattern jury instruction on the definition of wrongfulness. The instruction stated:

The term "wrongfulness," as used in these instructions, means moral wrongfulness as well as criminal wrongfulness. In other words, if you find that the defendant as a result of a severe mental disease or defect, was unable to appreciate the moral wrongfulness of his acts, even if he appreciated his acts to be criminal but commits them because of a delusion that he was morally justified, then your verdict must be not guilty only by reason of insanity.

The government objected on grounds that the distinction articulated between moral and criminal wrongfulness was an incorrect statement of law, and also argued that no instruction on the distinction was necessary based on the evidence in the case or Ewing's theory of defense. Alternatively, the government proposed the following instruction on wrongfulness, should the court determine one necessary:

When the word "wrongfulness" is used in these instructions, it means contrary to public morality, as well as contrary to law. However, evidence that the defendant knew his conduct was contrary to law may be considered by you in determining whether the defendant appreciated that his conduct was contrary to public morality.

Relying on *United States v. Reed*, 997 F.2d 332 (7th Cir. 1993), the district court rejected the defense's proposed instruction, concluding that it was an incorrect statement of law because it defined wrongfulness according to the

defendant's personal standards of morality. The court reserved judgment on whether any wrongfulness instruction was necessary.

Trial commenced on September 14, 2004. The prosecution conceded Ewing suffered from paranoid schizophrenia but argued he was not legally insane because he was able to appreciate the wrongfulness of his actions. The first witness to testify was Judge Miller. During the lunch break following the judge's testimony, defense counsel informed the court that Ewing had become agitated during cross-examination of Judge Miller and wanted to know why his counsel would not produce a copy of the nonexistent $25 million judgment. In response to questions from the court, Ewing expressed his continuing belief that the judgment was in his file and insisted his counsel be removed and "adjudged for lying under oath." The court denied his request for new counsel and recessed for lunch. Before bringing the jury back into the courtroom after the lunch break, the judge advised counsel that he had been continuously evaluating Ewing's behavior in light of Dr. Mrad's report. The court concluded that Ewing remained competent to stand trial based on his demonstrated understanding of the proceedings and ability to articulate his opinions regarding defense strategy.

At the close of the first day of trial, defense counsel notified the court that Ewing again had become very agitated during cross-examination of another witness regarding the $25 million judgment. The judge noted that he had been watching Ewing during the same cross-examination and observed nothing other than him talking with cocounsel. The judge agreed to address the issue further the next morning. When he did so, Ewing told the court: "I don't want to disclose [counsel's] strategy at the time, and I think it's best that I leave that issue alone and let the attorneys take care of the matter as they had

planned as far as his strategy, and I don't want to interfere with that." The trial then proceeded.

Ewing's insanity defense was premised on the theory that Ewing believed his actions were justified based on his delusion that Judge Miller was part of a mind-reading conspiracy. Dr. Chapman testified that to Ewing, the delusions of mind reading were akin to mental slavery from which he had to escape by whatever means necessary. Dr. Chapman reported that Ewing made the following statements during one of his examinations: "I didn't consider what I was going to do as illegal or criminal because I was in the right, and what [Judge Miller] was doing was illegal, reading my mind and conspiring with others to steal my ideas for commercial purposes—commercial profit. I never considered arrest." Based on this evidence, the district court concluded over the government's objection that a jury instruction would be necessary to distinguish between moral and criminal wrongfulness. Over the defense's objection, however, the court again rejected Ewing's proposed "moral justification" instruction as a misstatement of the law and instead used the alternative proposed by the government, which defined the term wrongfulness as "contrary to public morality, as well as contrary to law." The jury returned verdicts of guilty on September 17, 2004.

## D.  Posttrial and Sentencing Proceedings

On December 23, 2004, Ewing's counsel filed a motion for a new trial based on new evidence. The new evidence consisted of statements Ewing made during his presentence interview indicating that he lied prior to trial regarding the extent of his delusions because he wanted the trial to go forward. In a letter to his counsel dated September 29, 2004, Ewing wrote in part:

> I believe that all of the jury in my case have before, during and after my trial were reading my mind, by wireless control through a supercomputer as well as by the prosecution for the United States. . . . During my evaluation for competency to stand trial . . . I had to tell Doctor Marad [sic] of Springfield MO that I do not believe that people can read my mind. I had to do this in order for him to find me competent to stand trial. If I would have said to Attorney George Taseff that I feel that the jury or anyone else was reading my mind he would not have let me go to trial and I would have never been released back into the community to be with my family.

Defense counsel argued these statements demonstrated Ewing had not actually been competent to stand trial, but rather had misled the court and Dr. Mrad by withholding the truth about his mental state, thus warranting a new trial. The district court denied Ewing's motion, holding that the "new evidence" was not new, but instead was within the defense's knowledge at the time of trial and that the defendant in any event was not entitled to relief for actively concealing the truth.

Ewing appeared in court for sentencing on January 21, 2005. At that time he asked that his counsel be removed and insisted that the attorneys, the judge, and the jurors had all been reading his mind during his trial. Ewing was agitated and repeatedly interrupted the judge with delusional monologues. Based on this behavior, the court ordered him examined for competency to be sentenced. By order dated August 16, 2005, Ewing was found incompetent and was committed for treatment under 18 U.S.C. § 4244. In accordance with the procedures of § 4244, he was provisionally sentenced to the statutory maximum of life plus forty years in prison; that sentence is subject to alteration whenever Ewing regains competency to stand for sentencing.

Ewing now appeals his conviction, challenging the district court's refusal to give his proposed jury instruction on wrongfulness. He also maintains the court should have ordered another competency hearing, either when Ewing's persisting delusions were brought to its attention during trial or retrospectively once the court became aware after the trial that Ewing may have lied about the extent of his delusions on the eve of trial.

## II. Discussion

### A. Jurisdiction

Before we reach the merits of Ewing's appeal, there is a threshold question regarding our jurisdiction to review his conviction. When a defendant is found incompetent to stand for sentencing, he is committed for treatment and provisionally sentenced to the maximum term authorized by the offense. 18 U.S.C. § 4244(d). Once the defendant has sufficiently recovered to be released from treatment, the district court may modify the provisional sentence if it has not already expired. *Id.* § 4244(e). Thus, although Ewing received a sentence of life imprisonment plus forty years when he was committed, that sentence is provisional and subject to alteration should Ewing regain competency.

Whether a conviction may be appealed following imposition of a provisional sentence under § 4244 is a question of first impression in this circuit. Appellate jurisdiction is generally limited to review of "final decisions" by the district courts. *See* 28 U.S.C. § 1291. This limitation "embodies a strong congressional policy against piecemeal reviews, and against obstructing or impeding an ongoing judicial proceeding by interlocutory appeals." *United States v. Nixon*, 418 U.S. 683, 690 (1974). In the criminal context, the general rule is that an appeal

may not be taken until a sentence has been imposed. *See, e.g.*, *Holman v. Gilmore*, 126 F.3d 876, 881 (7th Cir. 1997). But that is not always the case. The rule is intended to prevent defendants who are not yet subject to judicial control from prematurely appealing their convictions. *See Korematsu v. United States*, 319 U.S. 432, 434 (1943) (holding that direct appeal can be taken following imposition of probation without a formal sentence because probation subjects a defendant to judicial control). It is not intended to deny review to defendants who have not received a "final" sentence but nonetheless are subjected to judicial control for a criminal conviction, as when imposition of sentence is suspended and the defendant is placed on probation. *Id.* ("[C]ertainly when discipline has been imposed, the defendant is entitled to review."). The imposition of discipline subjecting the defendant to the orders of the court makes a conviction final for purposes of appeal. *Id.*

The Supreme Court has held in a different context that a provisional sentence can be considered final for purposes of appeal. In *Corey v. United States*, 375 U.S. 169 (1963), the Court considered a now-repealed statute similar to § 4244. The statute permitted a district court to commit a defendant to the custody of the Attorney General for three to six months of observation before imposing a sentence. *Id.* at 172. During that time, the defendant was provisionally sentenced to the maximum for his offense, and that sentence could be adopted or revised at the end of the commitment. The Court concluded that the provisional sentence was "clearly not lacking in sufficient 'finality' to support an immediate appeal" because it was imposed after conviction and placed the defendant in custody. *Id.* at 173-74. The Court cautioned that a contrary result "might raise constitutional problems of significant proportions." *Id.*

Relying upon *Corey*, the only circuit court to address the question of jurisdiction over an appeal following a § 4244 provisional sentence concluded that jurisdiction exists.[1] *See United States v. Abou-Kassem*, 78 F.3d 161, 167 (5th Cir. 1996). In *Abou-Kassem,* the Fifth Circuit held that a defendant provisionally sentenced under the procedures established in § 4244 has been convicted of the underlying crime and committed to custody, thereby making the provisional sentence sufficiently final for purposes of appeal. *Id.* at 167-68. "Were we to accept the opposing view," the court commented, "we would be countenancing the totally unacceptable proposition that a defendant could be incarcerated for many years . . .

---

[1] There is some conflicting authority regarding the finality of a provisional sentence under 18 U.S.C. § 3552(b), which also authorizes commitment of a defendant for observation prior to final sentencing. In *United States v. Muther*, the Eleventh Circuit concluded that Congress did not intend a provisional sentence under § 3552(b) to be final because the statute does not provide the district court the option of adopting the provisional sentence, but rather requires imposition of a new sentence after the commitment has concluded. 912 F.2d 1371, 1373 (11th Cir. 1990). *But see United States v. Donaghe*, 924 F.2d 940, 943 (9th Cir. 1991) (holding that a provisional sentence under § 3552(b) is final).

Regardless of whether the *Muther* decision was correct as to § 3552(b), the distinction the Eleventh Circuit relied on is not relevant here because § 4244 explicitly contemplates the possibility of adopting the provisional sentence. *See* § 4244(e) (district court *"may* modify the provisional sentence" once defendant is found competent (emphasis added)). Moreover, the Eleventh Circuit was particularly concerned with ripeness because the defendant's appeal included claims regarding the final sentencing proceeding, which had yet to occur. Ewing's appeal is limited to the underlying trial and posttrial proceedings that have already taken place; as such, there is no ripeness concern present here.

without meaningful opportunity to challenge timely the validity of his conviction.*" Id.* at 168.

We agree with the Fifth Circuit that a provisional sentence imposed pursuant to § 4244 is sufficiently final for appeal. Like the defendants in *Corey* and *Abou-Kassem*, Ewing has been convicted of the underlying criminal charge and has been committed to custody and is subject to judicial control. Were he denied appeal until a final sentence is imposed, he might remain under commitment for the entire duration of the provisional sentence, with no opportunity to appeal his conviction. Nothing in § 4244 indicates that the provisional nature of the sentence imposed on a defendant committed for treatment deprives the district court's decision of the finality necessary to support an appeal. We are satisfied that Ewing's provisional sentence meets the criteria laid out in *Corey* and *Korematsu* to supply appellate jurisdiction over his appeal.

## B.  The Insanity Defense Statute, 18 U.S.C. § 17

Ewing's primary argument on appeal is that the district court improperly rejected his proposed jury instruction on the meaning of wrongfulness in the insanity defense statute. A defendant is entitled to a jury instruction if it represents an accurate statement of the law, if it reflects a theory that is supported by the evidence and not already part of the charge, and if the failure to include the instruction would deny the defendant a fair trial. *See United States v. Scott*, 267 F.3d 729, 738 (7th Cir. 2001). A refusal to give an instruction on a theory of defense is reviewed de novo, but the district court has "substantial discretion regarding the specific wording of the instructions, and in rejecting a proposed instruction, so long as the essential points are covered by the instructions given." *Id*. (citations omitted).

### 1.   Ewing's proposed subjective "wrongfulness" instruction

Under the Insanity Defense Reform Act of 1984 ("IDRA"), it is an affirmative defense to a prosecution for a federal crime if "at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts." 18 U.S.C. § 17(a). The defendant has the burden of proving insanity by clear and convincing evidence. *Id.* § 17(b).

The statute does not define "wrongfulness." In the context of the insanity defense, courts and scholars have generally proposed three alternative definitions for the term: (1) legal wrongfulness, as in "contrary to law"; (2) moral wrongfulness, as in "contrary to public morality," determined objectively by reference to society's condemnation of the act as morally wrong; or (3) moral wrongfulness, as in "contrary to *personal* morality," determined subjectively by reference to the defendant's belief that his action was morally justified (even if he appreciated that it was illegal or contrary to public morality). The district court concluded that Ewing's proposed jury instruction, adapted from the third of these definitions, was incorrect as a matter of law under this court's decision in *United States v. Reed*, 997 F.2d 332 (7th Cir. 1993).

*Reed* involved an appeal of a district court's determination after a bench trial that the defendant had not proven he was legally insane when he robbed a bank. In affirming the conviction, we noted that certain evidence in the record indicating the defendant knew his conduct was illegal was properly considered on the issue of whether he was able to appreciate its wrongfulness. *Id.* at 334. The district court cited *Reed* for the proposition that a "jury could [not] make a finding of not guilty [ ] if the defendant appreciated his acts to be criminal," and there-

fore concluded that Ewing's proposed instruction on moral wrongfulness was an inaccurate statement of the law. We do not interpret *Reed* quite so broadly; the case held only that a defendant's knowledge that his conduct was illegal may be taken into account when determining his ability to appreciate its wrongfulness. While we reaffirm the accuracy of that proposition, it sheds little light on the question presented here. Ewing's proposed instruction defined wrongfulness as "moral as well as criminal wrongfulness," and further defined "moral wrongfulness" by reference to the defendant's delusion of moral justification "even if he appreciated his acts to be criminal." Neither *Reed* nor any other circuit precedent addresses the meaning of wrongfulness in the IDRA, or more specifically, the distinction between objective and subjective moral wrongfulness.

Ewing relies primarily on *United States v. Segna*, 555 F.2d 226 (9th Cir. 1977), a decision by the Ninth Circuit, the only court to have adopted a subjective definition of wrongfulness like the one in Ewing's proposed instruction.[2] There are a number of problems with reliance on *Segna*. First, the case predates the codification of the federal insanity defense and instead interprets wrongfulness as used in the *Model Penal Code*'s definition of legal insanity. That definition states: "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirements of law." MODEL PENAL CODE § 4.01. *Segna* relied principally on commentary from the American Legal

---

[2] Ewing's proposed jury instruction is the same instruction that the defendant requested and the *Segna* court ultimately accepted as an accurate definition of wrongfulness. *See United States v. Segna*, 555 F.2d 226, 232 (9th Cir. 1977).

Institute ("ALI") accompanying the formulation of this definition. But Congress did not adopt the *Model Penal Code*'s definition of insanity when it enacted the IDRA. Accordingly, neither the ALI commentary nor cases relying upon it are appropriate sources for interpretation of the statute.[3] Moreover, although there is far from a robust body of case law on the issue, *Segna*'s subjective definition of wrongfulness—even in the context of § 4.01 of the *Model Penal Code*—has been rejected by those courts to consider it since. *See, e.g.*, *State v. Wilson*, 700 A.2d 633, 640-41 (Conn. 1997); *People v. Serravo*, 823 P.2d 128, 138 (Colo. 1992); *State v. Worlock*, 569 A.2d 1314, 1322 (N.J. 1990).[4]

---

[3] There is some similarity in the wording of 18 U.S.C. § 17 and MODEL PENAL CODE § 4.01. However, absent statutory language paralleling § 4.01, we decline to treat either § 4.01 or its commentary as a reliable source of interpretation of the statute. For the same reason, the bulk of federal case law on the insanity defense predating the enactment of § 17 is unhelpful; like the Ninth Circuit, most federal courts (ours included) had adopted § 4.01 as the standard for legal insanity and therefore relied on the ALI commentary for interpretation. *See, e.g.*, *Blake v. United States*, 407 F.2d 908, 915-16 (5th Cir. 1969) (en banc); *United States v. Shapiro*, 383 F.2d 680, 686 (7th Cir. 1967) (en banc); *United States v. Freeman*, 357 F.2d 606, 622 (2d Cir. 1966).

[4] One of the reasons courts have rejected *Segna* is that it may have mischaracterized the ALI commentary. *Segna* cited no specific statements in the commentary, but rather summarily concluded that "the weight of the discussion [in the ALI] debates points toward a preference for the [subjective] definition." 555 F.2d at 533 n.6. The ALI commentary accompanying § 4.01 states in part: "Appreciating 'wrongfulness' may be taken to mean appreciating that the community regards the behavior as wrongful. Given the seriousness of most crimes for which the defense of insanity is interposed, a defendant who appreciates society's moral disapproval of his conduct will almost always

(continued...)

Only the Eighth Circuit has given the term wrongfulness relevant consideration since the passage of the IDRA. *See United States v. Dubray*, 854 F.2d 1099 (8th Cir. 1988). The court in *Dubray* concluded that the term has the broader meaning of moral rather than criminal wrongfulness; that is, the court held that a defendant who because of mental disease or defect is unable to appreciate the moral wrongfulness of his conduct may establish an insanity defense "even where the defendant knows that the conduct is illegal." *Id.* at 1101. But the decision in *Dubray* did not address the distinction between objective and subjective morality, which is the crux of this appeal. We are aware of only one district court decision that has discussed the issue. *See United States v. Danser*, 110 F. Supp. 2d 807, 826 (S.D. Ind. 1999). In *Danser,* Judge Tinder suggested it was unlikely that Congress had adopted a "purely subjective standard of morality" when it enacted § 17, *id.* at 826 n.13, but the evidence in the case before him was insufficient to establish the insanity defense under *either* an objective or subjective definition, so he was not required to choose.

## 2.  The IDRA and *M'Naghten*

Although various formulations of the insanity defense were proposed throughout the twentieth century, the language of the IDRA closely resembles the common-law *M'Naghten* standard. *Compare* 18 U.S.C. § 17 *with* MODEL PENAL CODE § 4.01 (adopting a combination of the

---

[4] (...continued)
assume that the conduct is criminal, and vice versa." MODEL PENAL CODE § 4.01 cmt. 3 at 169 (1985) (footnote omitted). Based on this language, other courts have found the commentary ambiguous at best, if not actually in support of an objective public standard of morality.

*M'Naghten* test and an "irresistible impulse" test), *and Durham v. United States*, 214 F.2d 862 (D.C. Cir. 1954) (establishing the so-called "*Durham* test" focusing on whether defendant's conduct was "the product of a mental disease or defect"), *overruled by United States v. Brawner*, 471 F.2d 969 (D.C. Cir. 1972) (adopting MODEL PENAL CODE § 4.01). The precise language of the *M'Naghten* test has been altered at common law and by state statute, but its essential elements are codified in the IDRA: to establish the affirmative defense of insanity, the defendant has the burden of proving that at the time of the offense, as a result of a severe mental disease or defect, he was unable to appreciate the nature and quality or wrongfulness of his acts.

The IDRA, as we have noted, does not define "wrongfulness"; the term is admittedly susceptible of the multiple definitions discussed above. Because the statute adopts the elements of the *M'Naghten* test, however, we may infer that wrongfulness carries the same meaning as in *M'Naghten's Case* and the common law that developed around it. *See N.L.R.B. v. Amax Coal Co., a Div. of Amax, Inc.*, 453 U.S. 322, 329 (1981) ("Where Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms."); *accord In re Chambers*, 348 F.3d 650, 655 (7th Cir. 2003).

*M'Naghten's Case*, 8 Eng. Rep. 718 (1843), concerned a British common-law trial with facts not unlike those at issue in this appeal. In 1843, acting under a delusion that the Tory political party was persecuting him, Daniel M'Naghten shot and killed Edward Drummond, private secretary to Prime Minister Sir Robert Peel. *See generally*

Richard Moran, Knowing Right from Wrong (1981).[5]
M'Naghten presented an insanity defense based on the
theory that a defendant could not be found guilty of any
act committed while he was laboring under a delusion,
regardless of whether the act was a direct product of that
delusion. *Id.* at 93-94. The jury found M'Naghten not guilty
by reason of insanity. In response to public and royal
outrage following the verdict, the House of Lords asked
the judges of the Queen's Bench to answer five ques-
tions regarding the proper formulation of the insanity
defense. *Id.* at 21-22. Their responses served as the basis
for the development of American law on the insanity
defense over the next 150 years.

Although the language of the *M'Naghten* insanity test
comes from a particular passage of the case, it is helpful to
review each of the judges' relevant responses to under-
stand the meaning of that language. The first question
from the House of Lords posited circumstances quite
similar to Ewing's defense here, in which "the accused
knew he was acting contrary to law, but did the act
complained of with a view, under the influence of insane

---

[5] M'Naghten apparently shot Drummond under the mistaken
belief that he was Prime Minister Peel. Richard Moran,
Knowing Right from Wrong 7 (1981). Moran's detailed account
of the facts surrounding M'Naghten's actions and trial presents
a convincing argument that M'Naghten may not have been
insane, but instead crafted the defense after being paid to
assassinate Peel. Whether M'Naghten really was delusional is
irrelevant to understanding the legal proceedings that ensued;
nonetheless, Moran provides a fascinating study of the facts
behind the famous case.

Moran also analyzes the accuracy of various possible spellings
of the defendant's name. *Id.* at xi-xiii. Although he ultimately
deems "McNaughtan" the most likely spelling, we will use
"M'Naghten," the spelling used in the original opinion.

delusion, of redressing or revenging some supposed grievance or injury, or of producing some supposed public benefit." 8 Eng. Rep. at 720. The judges responded that such a defendant "is nevertheless punishable according to the nature of the crime committed, if he knew at the time of committing such crime that he was acting contrary to law; by which expression we understand your Lordships to mean the law of the land." *Id.* at 722.

In response to the next two questions regarding the proper inquiry to be submitted to a jury in an insanity defense case, the judges provided the test used in most American courts over the next century:

> [T]o establish a defense on the ground of insanity, it must be clearly proved that, at the time of committing the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing, or, if he did know it, that he did not know he was doing what was wrong.

*Id.* The judges explained that they used the term "wrong" instead of "illegal" to prevent "confound[ing] the jury, by inducing them to believe that an actual knowledge of the law of the land was essential in order to lead to a conviction." *Id.* at 723. Rather, the proper inquiry was "[i]f the accused was conscious that the act was one that he ought not to do, and if that act was at the same time contrary to, the law of the land." *Id.*

The final response bearing on wrongfulness came from the fourth question posed, which is again of particular relevance to Ewing's defense: "If a person under an insane delusion as to existing facts, commits an offence in consequence thereof, is he thereby excused?" *Id.* at 720. The judges answered:

> [W]e think he must be considered in the same situation as to responsibility as if the facts with respect to

which the delusion exists were real. For example, if under the influence of his delusion he supposes another man to be in the act of attempting to take away his life, and he kills that man, as he supposes, in self-defence, he would be exempt from punishment. If his delusion was that the deceased had inflicted a serious injury to his character and fortune, and he killed him in revenge for such supposed injury, he would be liable to punishment.

*Id.* at 723.

These responses shed light on two aspects of the original *M'Naghten* test critical to the meaning of wrongfulness. First, they demonstrate that the relevant inquiry, according to the Queen's Bench, was not a defendant's actual knowledge of the criminal law under which he was accused, but rather whether the defendant understood the difference between right and wrong.[6] The second point,

---

[6] *M'Naghten's Case* thus refutes Ewing's contention that the second of the possible definitions of wrongfulness (societal or public morality) is not meaningfully distinct from the first (criminality). *See* Brief of Defendant-Appellant at 34 ("[A]lmost all cases giving rise to an insanity plea involve serious crimes where there is likely to be no difference between publicly accepted moral standards and the law. A public morality standard frustrates legislative intent by rendering Congress's choice of the word 'wrongfulness' in lieu of criminality meaningless." (citation omitted)). *M'Naghten's Case* demonstrates that "wrongfulness" is substituted for "criminality" not to create two (or more) distinct moral codes by which a defendant's conduct could be judged, but rather to ensure that the inquiry remains focused on a defendant's ability to understand wrongfulness, rather than his *actual knowledge* of the law. *Cf. State v. Harmann*, 285 N.W.2d 180, 183 (Iowa 1979) ("[Rejecting the subjective definition] is not to say, as has sometimes been suggested, that sanity would thereby be measured by legal
(continued...)

illustrated by the judges' fourth response, is that the right-versus-wrong test asked not whether *the defendant* believed he was justified based on his delusional view of reality, but whether *society* would judge his actions an appropriate response to his delusions. Thus, as applied to M'Naghten, the judges' responses illustrate that his conduct was not properly excused because his deluded belief in a governmental conspiracy against him—*even if true*—did not justify his knowingly wrongful act of murder.[7]

Accordingly, "criminality" or "contrary to law" is too narrow a definition of wrongfulness, and "subjective personal morality" is too broad. The second of the alternative definitions of wrongfulness—contrary to objective societal or public morality—best comports with the rules established in *M'Naghten's Case*. This conclusion is consistent with the holdings of American courts that analyzed the issue prior to 1984, when Congress adopted the IDRA.[8] Although case law relevant to our specific inquiry is sparse, a brief canvas of those cases that are on point supports our conclusion that the *M'Naghten*

---

[6] (...continued)
knowledge. . . . The determination is to be made on the basis of a person's ability to understand it when something is prohibited by law.").

[7] Like Ewing, M'Naghten argued not that he thought Drummond was directly attacking him, but rather that he believed his act an appropriate response to the looming conspiracy against him. MORAN at 98. Presumably, the bench's answers would lead to a different result had M'Naghten argued that he believed his life to be in *imminent* danger from Drummond at the moment he committed the murder.

[8] We limit our review to those cases on the books prior to the codification of the federal insanity defense because those cases form the basis for the common-law test Congress was adopting.

wrongfulness inquiry is to be judged according to objective societal standards of morality.

We begin with *People v. Schmidt*, 110 N.E. 945 (N.Y. 1915), which Ewing cites to support his assertion that American courts have traditionally read *M'Naghten* to espouse the subjective definition of wrongfulness. In particular, Ewing relies on language from *Schmidt* in which then-Judge Cardozo explained how a New York statute adopting the *M'Naghten* test might provide a defense for someone who because of mental illness believed himself directed by God to commit a crime—the so-called "deific decree" defense. *See id.* at 949 ("If, however, there is an insane delusion that God has appeared to the defendant and ordained the commission of a crime, we think it cannot be said of the offender that he knows the act to be wrong."). Ewing argues that Cardozo's approving reference to the deific decree defense demonstrates that the *M'Naghten* wrongfulness inquiry focuses on the defendant's personal beliefs about morality or moral justification.

Ewing's reliance on this aspect of *Schmidt* is misplaced. Cardozo's opinion for the Court of Appeals of New York carefully distinguished between the deific decree defense and the sort of insanity defense brought in *M'Naghten's Case* and asserted by Ewing here. Relying on the response provided to the first *M'Naghten* inquiry, Cardozo concluded that a defense based on a defendant's personal definition of wrongfulness would not suffice to prove insanity under *M'Naghten*. *Id.* at 948. Cardozo explained the difference between the two defenses:

> A delusion that some supposed grievance or injury will be redressed, or some public benefit attained, has no such effect in obscuring moral distinctions as a delusion that God himself has issued a command. The one delusion is consistent with knowledge that the act is a moral wrong, the other is not.

*Id. Schmidt* does not support Ewing's proposed subjective definition of wrongfulness. To the contrary, the case supports our conclusion that moral wrongfulness is determined by reference to societal or public standards of morality. *Accord People v. Wood*, 187 N.E.2d 116, 121 (N.Y. 1962) (relying on *Schmidt* in approving a jury instruction that "[w]hen it speaks of the defendant's ignorance of his act as wrong, the law does not mean to permit the individual to be his own judge of what is right or wrong").

*People v. Rittger*, 355 P.2d 645 (Cal. 1960), also supports an objective rather than subjective definition of wrongfulness. California had judicially adopted the *M'Naghten* rule in the absence of a state statute on the insanity defense. In *Rittger,* a jury had rejected an insanity defense premised on the defendant's disturbed belief that he had to murder his victim for his own future protection. In affirming the conviction, the California Supreme Court held:

> The fact that a defendant claims and believes that his acts are justifiable according to his own distorted standards does not compel a finding of legal insanity. . . . This is necessarily so if organized society is to formulate standards of conduct and responsibility deemed essential to its preservation or welfare, and to require compliance, within tolerances, with those standards.

355 P.2d at 653 (citation omitted). The court in *Rittger* plainly rejected the notion that a defendant's subjective beliefs about moral justification satisfy the *M'Naghten* test in the face of evidence that the defendant understood his conduct to be contrary to societal standards of morality.

Other state court authority supports the conclusion that *M'Naghten*'s wrongfulness inquiry focuses on the defen-

dant's ability to appreciate that his conduct was contrary to public or societal standards of morality. *See, e.g.*, *State v. Crenshaw*, 659 P.2d 488, 493 (Wash. 1983) ("[I]n discussing the term 'moral' wrong, it is important to note that it is society's morals, and not the individual's morals, that are the standard for judging moral wrong under *M'Naghten*."); *State v. Hamann*, 285 N.W.2d 180, 183 (Iowa 1979) ("Those states which believe the right or wrong test should be conducted with a view to moral right or wrong are quite uniform in rejecting a subjective test."); *State v. Corley*, 495 P.2d 470, 473 (Ariz. 1972) ("We find no authority upholding the defendant's position that one suffering from a mental disease could be declared legally insane if he knew that the act was morally and legally wrong but he personally believed that act right."). We have found no pre-1984 cases supporting Ewing's interpretation of *M'Naghten*.

There is nothing in the IDRA to suggest that wrongfulness should be interpreted more broadly than or contrary to the traditional understanding of the *M'Naghten* test. We conclude that wrongfulness for purposes of the federal insanity defense statute is defined by reference to objective societal or public standards of moral wrongfulness, not the defendant's subjective personal standards of moral wrongfulness. As such, the district court correctly rejected Ewing's proposed jury instruction as an inaccurate statement of law. That instruction would have impermissibly allowed a finding of legal insanity based on Ewing's subjective belief that his conduct was morally justified, despite an appreciation that his conduct was illegal or contrary to public morality. By contrast, the government's instruction appropriately focused the insanity inquiry on Ewing's ability to appreciate moral wrongfulness, without making knowledge of the law conclusive as to his understanding of wrongfulness.

Although we agree with the district court that Ewing's proposed instruction was legally inaccurate and find no error in the court's use of the government's "public morality" instruction, we caution that not every insanity defense case calls for an instruction on the distinction between moral and legal wrongfulness like the one used here. *See Dubray*, 854 F.2d at 1101 ("The jury should be instructed on the distinction between moral and legal wrongfulness . . . only where the evidence at trial suggests that this is a meaningful distinction in the circumstances of the case."); *Segna*, 555 F.2d at 233. Whether the evidence here warranted a specific definition of wrongfulness was a close call. Ewing's theory of defense was that his conduct was based on his conspiracy delusions and his belief in the moral justification of attacking Judge Miller. Dr. Chapman testified that Ewing told him he "didn't consider what [he] was going to do as illegal or criminal because [he] was in the right." The district court interpreted this statement as evidence that Ewing knew his conduct was illegal but nevertheless considered his actions morally justified, and therefore an instruction on moral wrongfulness (as distinct from illegality or criminal wrongfulness) was necessary. This was a permissible interpretation of the evidence, and because Ewing specifically requested an instruction on moral wrongfulness and the instruction given was accurate, his challenge to the court's use of the government's alternative instruction fails. Nonetheless, we take this opportunity to clarify that an instruction on the meaning of wrongfulness should be given only when there is evidence that warrants it.

## C. Competency Determinations

To be competent to stand trial, a defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding [and] a

rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960). A court must hold a competency hearing if there is reasonable cause to believe the defendant may presently be incompetent. 18 U.S.C. § 4241; *see also Timberlake v. Davis*, 409 F.3d 819, 822 (7th Cir. 2005) ("the due process clause requires the trial judge to inquire *sua sponte* into a defendant's mental state, if events in court imply that the accused may be unable to appreciate the nature of the charges or assist his counsel in presenting a defense").

A district court's decision whether to hold a competency hearing is discretionary and reviewed deferentially; its findings regarding competency are reviewed for clear error. *United States v. Downs*, 123 F.3d 637, 641 (7th Cir. 1997). In *Downs*, we upheld the district court's decision not to hold a full competency hearing prior to accepting a guilty plea despite a psychiatrist's opinion that the defendant's "judgement is impaired and that this should be taken into consideration when making decisions about the disposition of his case." *Id.* at 640. In doing so, we affirmed that "[a] trial court is always in the best position to determine the need for a competency hearing." *Id.* at 641 (quotation and citation omitted). We also noted in *Downs* that defense counsel never sought a full competency hearing during the proceedings and indicated the defendant was appropriately assisting in his defense. *Id.*

The district court did not abuse its discretion by not holding a competency hearing during Ewing's trial. The court found Ewing competent on September 8—less than one week before trial began—based on an evaluation by his long-time psychiatrist, Dr. Mrad. Although Dr. Mrad described Ewing as only "minimally competent" at that proceeding, he made it clear that Ewing's ongoing conspiracy delusions did not render him incapable of

understanding the proceedings or assisting in his defense. Ewing's delusions persisted during trial, but the court made certain to question him directly whenever he displayed any signs of potential mental deterioration. The record supports the court's findings in each of those instances that Ewing was oriented to and participating appropriately in the proceedings. Dr. Chapman, Ewing's expert, was present to observe Ewing throughout the trial, yet at no time did he or defense counsel seek an additional competency evaluation once the trial was underway.

We also reject Ewing's contention that the court should have ordered a retrospective competency hearing—a proceeding the defense never requested—once it became aware Ewing may have lied during his pretrial examination.[9] Retrospective competency hearings are generally disfavored, *see, e.g.*, *Galowski v. Berge*, 78 F.3d 1176, 1180-81 (7th Cir. 1996), and Ewing points to no case requiring such a proceeding based on a defendant's assertion that he actively concealed his mental state. Ewing's posttrial claim that he minimized the severity of his delusions does not call into question the court's earlier

---

[9] We say "may have" because it is unclear whether Ewing's posttrial statements were a rational explanation of his frame of mind prior to trial, or rather a symptom of his resurfacing paranoia in the months that followed. At trial, although Ewing clearly suffered from some delusions relating to his ongoing mental illness, he was able to converse with the court and generally responded on point to the questions he was asked. By contrast, at his first sentencing—which the court adjourned for purposes of another competency hearing—Ewing responded to questions with long rants about the conspiracies against him and repeatedly talked over the judge without internalizing any of the judge's responses. Ewing did not exhibit anything close to this behavior, for example, when he asked to have his counsel removed mid-trial.

competency determination. Dr. Mrad was fully aware of Ewing's conspiracy delusions; indeed, the doctor's report took into account the continuation of those delusions. His opinion that Ewing was competent was based on the fact that Ewing was oriented and capable of participating in his defense *despite* the persistent conspiracy delusions.

The district court's determination that Ewing was competent to stand trial and remained competent during trial is adequately supported by Dr. Mrad's opinion and the court's own contemporaneous personal observations. The court carefully monitored Ewing's competency throughout the entirety of these proceedings. Ewing's posttrial statements about concealing the true extent of his delusions from Dr. Mrad did not require the court to order, sua sponte, a retrospective competency hearing.

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*