NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-1372
_____

UNITED STATES OF AMERICA

v.

NOAH CUEBAS,
a/k/a Rah Rah,
a/k/a Rashon Jones

NOAH CUEBAS,

Appellant

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 06-cr-00613-001)
District Judge:  Honorable Joseph A. Greenaway, Jr.
_____

Submitted Under Third Circuit LAR 34.1(a)
February 17, 2011

Before:  SLOVITER and HARDIMAN, *Circuit Judges* and JONES[*], *District Judge*.

(Filed: February 18, 2011)
_____

OPINION OF THE COURT
_____

[*]The Honorable C. Darnell Jones, District Judge for the United States District
Court for the Eastern District of Pennsylvania, sitting by designation.

HARDIMAN, *Circuit Judge*.

Following a jury trial, Noah Cuebas was convicted of one count of armed carjacking and one count of discharging a firearm during the commission of a crime of violence. Cuebas appeals his convictions and sentence. We will affirm.

I

A

Because we write for the parties, we recount only the essential facts and procedural history. We review the facts in the light most favorable to the Government as the verdict winner. *United States v. Abbott*, 574 F.3d 203, 204 n.1 (3d Cir. 2009).

On July 8, 2006, at approximately 5:00 a.m., W.S. and his girlfriend Y.S. were parked in W.S.'s rented Dodge Magnum behind an apartment building in East Orange, New Jersey. While parked, W.S. observed a man later identified as Cuebas walk past the car. Shortly thereafter, while the couple was having sex in the front passenger seat, Cuebas returned to the car, brandished a gun, and ordered the couple to open the door. W.S. opened the door, and Cuebas struck him repeatedly in the face and head with the gun. W.S. gave Cuebas his cash, silver watch, cell phone, and approximately fifteen packets of cocaine. Cuebas then ordered W.S. into the trunk, and proceeded to rob Y.S.

Cuebas then had W.S. move from the trunk into the driver's seat. After W.S. had driven a short distance, Cuebas ordered him out of the car and instructed Y.S. to take the

wheel.[1]  Once W.S. had exited the vehicle, Cuebas demanded sex from Y.S.  She initially refused and Cuebas threatened to kill her.  Cuebas then offered to take Y.S. home if she complied with his demand.[2]  Y.S. relented, and they drove into a side street where Cuebas raped her at gunpoint.  Cuebas then ordered Y.S. to drive into the parking lot of a nearby church.  While they were driving, Cuebas told Y.S. that he was going to kill her.  Y.S. pleaded for her life, telling Cuebas that she had a sick child at home who needed care.  Undeterred, Cuebas fired a single shot into Y.S.'s head soon after she parked the car.  Believing Y.S. to be dead, Cuebas quickly wiped down the interior and exterior of the car to remove his fingerprints, and walked away.

Approximately 90 minutes after Y.S. was shot, Newark police were alerted to her plight and found her bleeding profusely.  She was rushed to the hospital, where she underwent multiple neurosurgeries and remained in a coma for more than two months.

Approximately ten days after the shooting, Cuebas was arrested in Rahway, New Jersey for a parole violation.  Cuebas was questioned about the shooting but denied involvement.  He was then transferred to East Orange Police Station, where he was again questioned.  Although Cuebas again denied involvement in Y.S.'s shooting, he confessed

---

[1]  Upon being released, W.S. immediately ran into an apartment building and called the police.

[2]  Cuebas later admitted that after he learned that Y.S. was his neighbor, he decided to kill her to avoid being identified.  Cuebas also resolved to kill W.S. for the same reason.

to several other crimes, including at least two murders, one attempted murder, a number of robberies, and a separate carjacking on July 7, 2006, the day before the incident in question.  Cuebas was then transferred to Essex County where, during a third interrogation, he confessed to carjacking Y.S.  Cuebas also confessed to several other crimes, including seven murders, and three attempted murders.[3]  During his confession, Cuebas repeatedly referred to a feeling he described as "the calmness" that would come over him as he was committing crimes and allegedly contributed to his criminal impulses.

B

In August 2006, a grand jury indicted Cuebas on one count of armed carjacking in violation of 18 U.S.C. §§ 2119(2) and 2, and one count of discharging a firearm during the commission of a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(iii).  In March 2009, a four-count superseding indictment was issued, charging Cuebas with an additional count of carjacking and one count of brandishing a weapon during the commission of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii), stemming from the July 7, 2006 carjacking.[4]

Cuebas pleaded not guilty, and informed the District Court that he intended to raise an insanity defense.  The District Court ordered two Bureau of Prisons (BOP)

---

[3]  In April 2010, Cuebas pleaded guilty to two of these murders in a separate proceeding in Essex County, New Jersey.

[4]  After trial, Cuebas was acquitted of the additional counts contained in the

4

psychologists to evaluate his mental state, both of whom concluded that Cuebas was competent to stand trial, despite suffering from a severe character disorder.

Cuebas proceeded to trial, where he offered a markedly different account of Y.S.'s carjacking from the one he gave during his confession. He claimed that, several days before the carjacking, a man in a Dodge Magnum brandished a gun at him, and that when he observed W.S. pull into the parking lot next to his sister's apartment building, he believed that the man had returned to harm him and his family. Cuebas claimed that he watched the car for over an hour before deciding to preemptively attack its occupants. Cuebas denied robbing either W.S. or Y.S., and also denied subsequently raping Y.S. Cuebas testified that after entering the car he repeatedly heard the word "sacrifice" echoing in his head, which prompted him to shoot Y.S. in the church parking lot.

Cuebas was convicted of the charges relating to carjacking Y.S., and the Probation Office prepared a presentence investigation report (PSR). The PSR calculated Cuebas's United States Sentencing Guidelines (USSG) imprisonment range for the carjacking offense to be 324-405 months, which was capped at the statutory maximum of 300 months. The PSR also included a mandatory minimum consecutive term of 120 months imprisonment for discharging a firearm during the commission of a crime of violence, yielding a total Guidelines range of 420 months imprisonment.

At sentencing, Cuebas sought a downward departure based on his mental and

superseding indictment.

5

emotional conditions. The District Court not only denied the motion, but departed upward pursuant to USSG § 5K2.2 in view of the extraordinary injuries suffered by Y.S., and pursuant to USSG § 2B3.1 cmt. n.5, based on Cuebas's intent to commit murder. The District Court imposed a sentence of 300 months imprisonment for the armed carjacking to be followed by a consecutive sentence of life imprisonment for discharging a firearm during the commission of a crime of violence. This appeal followed.[5]

## II

Cuebas raises several challenges to the validity of his conviction.

## A

Cuebas first claims the District Court erred when it denied his motion for a mistrial. We review this claim for abuse of discretion. *United States v. Lee*, 612 F.3d 170, 193 (3d Cir. 2010).

At trial, Assistant United States Attorney R. Joseph Gribko questioned Cuebas about the inconsistencies between his confession to the police and his trial testimony. Gribko then suggested that Cuebas had a motive to lie at trial, and his questioning elicited the following exchange:

> Cuebas: No matter what happens, I am never going home. So what do I gain from this? No matter what verdict I get, I am not going home.

---

[5] The District Court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231. We have appellate jurisdiction pursuant to 28 U.S.C. §§ 1291 and 3742(a).

|  | I am either going to jail or the hospital.  I don't gain anything by lying. |
|---|---|
| AUSA Gribko: | That is not responsive to my question. |
| Cuebas: | I am not going to be set free.  I am either going to be in a hospital or jail. |

App. 656.  Gribko objected to Cuebas's statement; however, at sidebar, the District Court overruled his objection, reasoning that Cuebas's testimony was focused on his credibility, not potential punishment.

After the objection was overruled, and the District Court took a recess, the following ensued:

| AUSA Gribko: | When we left off you said it doesn't matter whether you are found guilty or not guilty by reason of insanity because you are going to be put away forever anyway. |
|---|---|
|  | Is that what you understood? |
| Cuebas: | From what I understand. |
| AUSA Gribko: | You acted as your own lawyer in this case, right? |
| Cuebas: | Yes, I did. |
| AUSA Gribko: | At various points.  And you did a lot of legal research, right? |
| Cuebas: | I just wanted my paper work. |
| AUSA Gribko: | You know if you are found not guilty by reason of insanity, you will get a hearing within 40 days of that verdict, do you not? |

| | |
|---|---|
| Cuebas: | That is the first time I'm hearing about that. |
| AUSA Gribko: | You know if you can tell them -- convince the Bureau of [P]risons at that hearing that you are not insane, that you will be released? |

*Id.* at 663. Defense counsel objected, arguing that Gribko's line of questioning impermissibly put Cuebas's potential punishment before the jury. The District Court convened a sidebar, and sustained the objection.

At sidebar, the District Court determined that a limiting instruction was necessary to cure any prejudice created by Gribko's questioning. Defense counsel objected to the use of such an instruction, and instead moved for a mistrial based either on prosecutorial misconduct or prejudice to the jury. The District Court denied both motions, reasoning that Gribko's questions had not been posed in bad faith and that, because of the limited duration of the questioning and the prompt, appropriate objection, any prejudice would be cured by the Court's instruction.

Cuebas claims a mistrial should have been declared because Gribko's questioning constituted prosecutorial misconduct that was so prejudicial that the District Court's curative instruction was inadequate. We disagree.

It is well established that "[a] prosecutor's comments can create reversible error if they so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Lee*, 612 F.3d at 194 (internal quotation omitted). The Supreme Court has cautioned, however, that "a criminal conviction is not to be lightly overturned on the basis

8

of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *United States v. Young*, 470 U.S. 1, 11 (1985). "If an appellate court finds that there has been prosecutorial misconduct, it should reverse unless the error is harmless." *United States v. Lore*, 430 F.3d 190, 210 (3d Cir. 2005) (internal citation omitted). An error is harmless if we "possess a sure conviction that the error did not prejudice the defendant." *United States v. Zehrbach*, 47 F.3d 1252, 1265 (3d Cir. 1995) (en banc) (internal quotation omitted).

We agree with the District Court that, although Gribko's questioning was improper, it did not prejudice Cuebas. As the District Court correctly noted, Gribko's remarks were extremely limited in duration and elicited a prompt objection from defense counsel. Moreover, the District Court quickly and adeptly instructed the jury that "the questions assumed facts and a process that are not accurate." App. 688. Under these circumstances, the District Court did not abuse its discretion in denying defense counsel's motion for a mistrial.

B

Cuebas next argues that the District Court erred by giving the jury a voluntary intoxication instruction during its final charge. At trial, Cuebas argued that his criminal acts were caused by his attention deficit hyperactivity disorder, posttraumatic stress disorder, depressive disorder, alcoholism, polysubstance abuse, and psychotic disorder.

9

Consequently, the prosecution proffered a charge stating that voluntary intoxication does not give rise to a severe mental disease or defect. Despite acknowledging that the evidence showed that he had used drugs prior to at least one of the carjackings, Cuebas argued that the instruction was improper because his counsel never argued that Cuebas was unaware of his actions because of intoxication. Moreover, counsel pointed out that Cuebas's history of drug and alcohol abuse had exacerbated his underlying mental illness, and he argued that a voluntary intoxication instruction might confuse the jury.

The District Court overruled Cuebas's objection in light of testimony that Cuebas had taken drugs, which might lead the jury to conclude that his intoxication influenced his behavior. Accordingly, the Court instructed the jury:

> The effects of the voluntary use of drugs or alcohol at the time of the offense do not constitute, nor may they legally give rise to a severe mental disease or defect. The voluntary use of drugs or alcohol at the time of the offense also must be disregarded in determining whether the defendant could appreciate the nature and quality of his acts or the wrongfulness of his acts.
>
> . . . .
>
> However, if you find that at the time in issue the defendant had a severe mental disease or defect, and that the disease or defect gave rise to an inability to appreciate the nature or quality or wrongfulness of his acts, then the defendant's subsequent consumption of drugs or alcohol, whether voluntary or involuntary, cannot preclude his defense of insanity.

App. 1070.

"Generally, we review the district court's refusal to give certain jury instructions

10

under an abuse of discretion standard although where . . . the question is whether the jury instructions stated the proper legal standard, our review is plenary." *United States v. Petersen*, 622 F.3d 196, 207 n.7 (3d Cir. 2010) (internal quotation omitted).

At trial, the jury was presented with evidence suggesting that Cuebas was voluntarily intoxicated during the commission of both carjackings. Cuebas himself testified that he had taken an ecstasy pill, smoked embalming fluid, and drank alcohol prior to committing the carjacking on July 7, 2006. Moreover, although Cuebas testified that he had only one drink prior to carjacking W.S. and Y.S., Dr. Miller, a BOP psychologist, testified that Cuebas suggested that he was under the influence of drugs at the time he committed the crime. Thus, although Cuebas did not actively pursue an intoxication defense, such evidence was placed before the jury. Therefore, a voluntary intoxication instruction was appropriate.[6]

Cuebas also argues that a voluntary intoxication instruction is never appropriate when an intoxicant exacerbates an underlying mental illness. Federal law governing the insanity defense is set forth in the Insanity Defense Reform Act of 1984 (IDRA). *See* 18 U.S.C. § 17. Pursuant to the IDRA, an insanity defense requires a defendant to prove, by clear and convincing evidence, that "at the time of the commission of the acts constituting

---

[6] It is also noteworthy that the District Court's voluntary intoxication instruction was limited to the use of drugs or alcohol "at the time of the offense." App. 1070. Thus, contrary to Cuebas's assertions, the instruction did not undermine his argument that his severe mental disease or defect was caused by his history of drug abuse.

11

the offense, the defendant, *as a result of* a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts." *Id.* at §17(a) (emphasis added).

The Second and Ninth Circuits have interpreted the IDRA as requiring the mental disease or defect *alone* to have prevented the defendant from appreciating the nature and quality or wrongfulness of his acts. *See United States v. Garcia*, 94 F.3d 57, 62 (2d Cir. 1996) (rejecting defendant's attempt to argue that voluntary intoxication that exacerbated mental illness should be considered in his insanity defense);[7] *United States v. Knott*, 894 F.2d 1119, 1122 (9th Cir. 1990) ("[U]nder the Insanity Defense Reform Act, the defendant's voluntary drug use or intoxication at the time of the crime may not be considered in combination with his mental disease or defect in determining whether the defendant was unable to appreciate the nature and quality or wrongfulness of his acts."). Under this view, a defendant cannot argue that the combination of voluntary intoxication and mental illness rendered him insane. Because we find these precedents persuasive, we hold that the District Court did not err when it instructed the jury on voluntary

---

[7] Cuebas mistakenly argues that *Garcia* left open whether a voluntary intoxication instruction is appropriate when a defendant's mental illness is exacerbated by voluntary intoxication. It is true that in *Garcia*, the Second Circuit declined to consider whether a voluntary intoxication instruction is appropriate when a defendant's history of substance abuse actually caused the underlying mental disease or defect. *Garcia*, 94 F.3d at 61 & n.1. However, the claim that the defendant's history of voluntary intoxication has *created* a mental disease or defect that has rendered him incapable of appreciating the nature of his actions is distinct from the claim that voluntary intoxication at the time of the offense

12

intoxication.

## C

Cuebas also claims the District Court erred in declining to supplement its definition of the term "wrongfulness" when it instructed the jury on the insanity defense. During its final charge, the District Court quoted the Third Circuit's model jury instruction as follows:

> The term "wrongful" means contrary to or against generally-accepted standards of right and wrong. Therefore, in order to find that the defendant was unable to appreciate the wrongfulness of his acts, you must find clear and convincing evidence that the defendant did not know, or did not understand that the acts were contrary to generally-accepted standards of right and wrong.
>
> Evidence that the defendant knew and understood that his conduct was against the law may be considered by you in determining whether the defendant appreciated that his conduct was contrary to public morality.

App. 1070-71. Prior to the final charge, the District Court denied Cuebas's request to add the following language to the end of the instruction:

> [E]ven if you find that the defendant lacked substantial capacity to appreciate the moral wrongfulness of his conduct, even if he knows the conduct to be criminal, but so commits it because of a delusion that he was morally justified.

*Id.* at 916. The District Court rejected this proposed language because it was drawn from a pre-IDRA case and it would "confuse[] the issue." *Id.*

"We review a district court's decisions regarding jury instructions for abuse of

*exacerbated* an individual's underlying mental illness.

13

discretion. We will order a new trial on account of a district court's refusal to give a proposed jury instruction only when the requested instruction was correct, not substantially covered by the instructions given, and was so consequential that the refusal to give the instruction was prejudicial to the defendant." *Untied States v. Hoffecker*, 530 F.3d 137, 167 (3d Cir. 2008).

Although the language of Cuebas's proposed instruction is ambiguous, it appears he was requesting the District Court to instruct the jury that a finding of subjective moral justification is sufficient to conclude that he was not acting wrongfully. Cuebas relies on *United States v. Segna*, 555 F.2d 226, 233 (9th Cir. 1977) (en banc), and *United States v. Dubray*, 854 F.2d 1099 (8th Cir. 1988), to support his argument.

Cuebas's argument is misguided. The Ninth Circuit's decision in *Segna* predated the IDRA, which expressly "narrowed the definition of insanity that had evolved from the caselaw." *Garcia*, 94 F.3d at 61. Although *Dubray* came after the IDRA, it cited to *Segna* and another Eighth Circuit case that predated the IDRA. Moreover, *Dubray* did not address the difference between objective and subjective morality, and, because the Court found the instruction inapplicable to the defendant's case, its overall discussion of the issue was limited.

Although the IDRA narrowed the scope of the insanity defense, it did not provide a definition of "wrongfulness." In *United States v. Ewing*, 494 F.3d 607 (7th Cir. 2007), the Seventh Circuit conducted a detailed analysis of the term. The Court noted:

14

> In the context of the insanity defense, courts and scholars have generally
> proposed three alternative definitions for the term: (1) legal wrongfulness,
> as in "contrary to law"; (2) moral wrongfulness, as in "contrary to public
> morality," determined objectively by reference to society's condemnation of
> the act as morally wrong; or (3) moral wrongfulness, as in "contrary to
> *personal* morality," determined subjectively by reference to the defendant's
> belief that his action was morally justified (even if he appreciated that it
> was illegal or contrary to public morality).

*Id.* at 616. The Court went on to state that, although courts have applied various formulations of the insanity defense, the language of the IDRA closely tracks the common law *M'Naghten* standard, which applies an objective societal standard for moral justification. *See M'Naghten's Case*, 8 Eng. Rep. 718 (1843). Thus, the *Ewing* Court reasoned that, in adopting a test akin to *M'Naghten*, Congress did not intend to allow subjective moral justification to factor into the insanity defense.

We agree with the *Ewing* Court's well-reasoned analysis. Moreover, our finding that subjective moral justification plays no role in determining whether a defendant was insane comports with congressional intent to narrow the insanity defense in the IDRA. Therefore, we hold that Cuebas's proposed jury instruction was an inaccurate statement of the law and was properly rejected by the District Court.

III

Having determined that the District Court committed no trial error, we turn to Cuebas's sentencing challenges. The District Court denied Cuebas's request for a downward departure and departed upward to a life sentence.

15

First, Cuebas claims he was entitled to a downward departure pursuant to USSG § 5H1.3 because of his mental and emotional conditions.  We reject this argument for lack of jurisdiction, because the District Court was aware of its discretion to depart and chose not to exercise it.  *See United States v. Watson*, 482 F.3d 269, 272 n.2 (3d Cir. 2007).

Cuebas next contends the District Court committed procedural error by failing to adequately consider his request for a downward variance based on his mental and emotional conditions.  For a sentence to be procedurally reasonable, "[t]he record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors." *United States v. Cooper*, 437 F.3d 324, 329 (3d Cir. 2006).  A "court need not discuss every argument made by a litigant if an argument is clearly without merit . . . . Nor must a court discuss and make findings as to each of the § 3553(a) factors if the record makes clear the court took the factors into account in sentencing." *Id.*

The District Court considered and rejected Cuebas's argument for a downward variance based on his individual history and characteristics.  The Court's statements at sentencing made clear that it viewed this crime as so heinous and calculated that no other aspect of Cuebas's history could mitigate his culpability.  Our review of the record leads us to conclude likewise.

Finally, Cuebas challenges the District Court's decision to depart upward and impose a sentence of life imprisonment.  Specifically, Cuebas argues that the Court's upward departure was unreasonable because the seriousness of the offense was already

taken into account by the Guidelines range, and because the District Court failed to

adequately consider his personal history and psychological conditions.

Pursuant to USSG § 5K2.0(a)(3), a sentencing court may depart upward "in an

exceptional case, even though the circumstance that forms the basis for the departure is

taken into consideration in determining the guideline range, if the court determines that

such circumstance is present in the offense to a degree substantially in excess of . . . that

which ordinarily is involved in that kind of offense." The District Court characterized

Cuebas's crimes as "bone chilling," and stated that they were "among the most depraved

that [it had] seen outside of fiction reading and cinema." App. 1175. Once again, the

view expressed by the District Court was well supported by the record.

The primary reason for the upward departure was the seriousness of the injuries

sustained by Y.S. The policy statement to USSG § 5K2.2 states:

> If significant physical injury resulted [from the crime], the court may
> increase the sentence above the authorized guideline range. The extent of
> the increase ordinarily should depend on the extent of the injury, the degree
> to which it may prove permanent, and the extent to which the injury was
> intended or knowingly risked. When the victim suffers a major, permanent
> disability and when such injury was intentionally inflicted, a substantial
> departure may be appropriate.

The record is replete with evidence detailing the severity of the injuries suffered by Y.S.,

which have left her permanently disabled and unable to care for herself. Indeed, the

District Court aptly noted that Y.S. survived only "through some miracle of divine

intervention." App. 1176. The upward departure was in no way an abuse of discretion

17

and the District Court quite reasonably concluded that Cuebas must spend the rest of his days in prison. *See* App. 1176 ("He is a miscreant, he cannot be among us.").

IV

For the foregoing reasons, we will affirm Cuebas's conviction and sentence.