UNITED STATES, Appellee

v.

Richard R. MOTT, Seaman
U.S. Navy, Appellant

No. 12-0604
Crim. App. No. 200900115

United States Court of Appeals for the Armed Forces

Argued January 23, 2013

Decided July 8, 2013

BAKER, C.J., delivered the opinion of the Court, in which
ERDMANN, STUCKY, and RYAN, JJ., and EFFRON, S.J., joined.


<u>Counsel</u>

For Appellant:  Lieutenant Ryan C. Mattina, JAGC, USN (argued).

For Appellee:  Major William C. Kirby, USMC (argued); Colonel
Stephen C. Newman, USMC, and Brian K. Keller, Esq. (on brief);
Colonel Kurt J. Brubaker, USMC.

Military Judges:  Moira Modzelewski and Daniel Daugherty


**THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.**

United States v. Mott, No. 12-0604/NA

Chief Judge BAKER delivered the opinion of the Court.

Contrary to his plea, Appellant was convicted at a general court-martial with members of attempted premeditated murder in violation of Article 80, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 880 (2006). The adjudged and approved sentence included confinement for nine years, a dishonorable discharge and reduction to pay grade E-1.[1] The United States Navy-Marine Corps Court of Criminal Appeals (CCA) affirmed. United States v. Mott, No. 200900115, 2012 CCA LEXIS 157, 2012 WL 1514770 (N-M. Ct. Crim. App. Apr. 30, 2012) (unpublished). We granted review on the following two issues:

I. A LACK OF MENTAL RESPONSIBILITY DEFENSE EXISTS WHEN A MENTALLY DISEASED ACCUSED CANNOT APPRECIATE THE WRONGFULNESS OF HIS CONDUCT. HERE, EXPERTS TESTIFIED THAT APPELLANT'S PARANOID SCHIZOPHRENIA AND SEVERE DELUSIONS CREATED HIS SUBJECTIVE BELIEF THAT STABBING THE VICTIM WAS JUSTIFIED. BUT THE MILITARY JUDGE AND NMCCA ADOPTED AN OBJECTIVE STANDARD FOR "WRONGFULNESS." WHAT IS THE APPROPRIATE STANDARD IN DETERMINING WHETHER AN ACCUSED CAN APPRECIATE THE WRONGFULNESS OF HIS CONDUCT?

II. UNDER THE FIFTH AMENDMENT, AN ACCUSED'S STATEMENT TO INVESTIGATORS IS ADMISSIBLE ONLY IF IT WAS OBTAINED WITH A VOLUNTARY, KNOWING, AND INTELLIGENT WAIVER WHERE THE ACCUSED UNDERSTANDS HIS RIGHTS AND THE CONSEQUENCES OF WAIVING THEM. HERE, EXPERT WITNESSES TESTIFIED THAT APPELLANT COULD NOT UNDERSTAND HIS RIGHTS OR THE

---

[1] Appellant was initially convicted in 2008 of attempted premeditated murder in violation of Article 80, UCMJ, 10 U.S.C. § 880 (2006), and sentenced to twelve years of confinement. On November 24, 2009, the CCA set aside the findings and sentence and ordered a rehearing. United States v. Mott, No. 200900115, 2009 CCA LEXIS 424, 2009 WL 4048019 (N-M. Ct. Crim. App. Nov. 24, 2009) (unpublished).

CONSEQUENCES OF WAIVING THEM BECAUSE OF HIS SEVERE MENTAL DISEASE. DID THE MILITARY JUDGE ERR BY ADMITTING THE STATEMENT?

In short, we conclude that the military judge did not err in his instructions in adopting an objective standard for "wrongfulness," but did abuse his discretion by admitting Appellant's statement without first contextually analyzing whether Appellant could and did knowingly and intelligently waive his right to counsel. See Edwards v. Arizona, 451 U.S. 477, 484 (1981) ("[T]he voluntariness of a consent or an admission on the one hand, and a knowing and intelligent waiver on the other, are discrete inquiries.").

## BACKGROUND

On March 6, 2007, Seaman Recruit (SR) JG reported for duty as a crew member aboard the USS CAPE ST. GEORGE (CG-71). 2009 CCA LEXIS 424, at *2, 2009 WL 4048019, at *1. Appellant and JG had never met before. 2012 CCA LEXIS 157, at *4, 2012 WL 1514770, at *2. On March 7, Appellant was at an office computer when he thought he overheard JG say to another crew member that he was "'going to have to kill MOTT'" and that he was going to kill Appellant's family. Later that day Appellant purchased a Winchester lock blade folding knife from the base exchange. The following morning, March 8, Appellant was working on the mess deck of the berthing barge being used by the ship's crew when he noticed JG sitting at a table. Appellant approached JG from

3

behind, slashed his throat and began repeatedly stabbing him in the chest and abdomen while repeatedly shouting "you raped me" or "he raped me." Appellant was subdued by nearby crew members and was taken into custody. 2012 CCA LEXIS 157, at *3, 2012 WL 1514770, at *1; 2009 CCA LEXIS 424, at *2, 2009 WL 4048019, at *1. That same day, he provided a sworn statement to Naval Criminal Investigative Service (NCIS) after a proper rights advisement under Article 31(b), UCMJ, 10 U.S.C. § 831(b) (2006). 2012 CCA LEXIS 157, at *3, 2012 WL 1514770, at *1. JG survived the attack but suffered serious and permanent injuries.

The bizarre content of Appellant's statement prompted the convening authority to order a mental health examination under Rule for Courts-Martial (R.C.M.) 706 on March 15, 2007. This examination concluded that Appellant suffered from "severe" "[s]chizophrenia, paranoid type" at the time of the offense and that he was "incompetent to stand trial."[2] Even after months of psychiatric treatment, as of January 2008 Appellant's residual

---

[2] Among other symptoms, Appellant experienced auditory hallucinations of his mother's voice, visual hallucinations including visions of a young Andrew Carnegie as an angel, and delusions including the belief that a senior al Qaeda official launched the 9/11 attacks because SN Mott had killed the terrorist's two sons after they had raped SN Mott. Appellant's shipmates gave him the nickname "Murder Mott" because he talked so much about murdering people. While Appellant was being treated at the Federal Medical Center at Butner, Appellant was documented "rinsing his food before eating it" and "manufactur[ing] a 'gas mask' from a beverage carton and strips of cloth."

4

delusional ideation and "significantly compromised cognitive capacities" prevented him from having a reality-based understanding of his legal situation. Malingering -- that is, faking mental illness -- was determined by the R.C.M. 706 examination to be "very unlikely": if anything, Appellant exhibited "a hesitancy to admit to problems of a psychological nature." A subsequent R.C.M. 706 examination was conducted on May 19, 2008. The examining psychiatrist concluded that, at the time of the offense, Appellant believed that "he was acting in self-defense," that "the only way to stop [JG from killing him] was to attack [JG]," and that his actions were "justified and not wrong." There is no dispute between the parties that at the time of his NCIS interview, Appellant was suffering from paranoid schizophrenia. 2012 CCA LEXIS 157, at *8, 2012 WL 1514770, at *3.

As part of Appellant's paranoid delusion at the time of the offense, he believed that sometime in the summer of 2003, a group of up to fifteen men had accosted him while he was at his girlfriend's apartment and gang raped him. 2009 CCA LEXIS 424, at *3, 2009 WL 4048019, at *1. He further believed that JG had been one of his assailants. Appellant was apparently hallucinating when he thought he heard JG threaten his life in the office on March 7, 2007, the day before the attack. Much of

5

Appellant's delusion is contained in his original statement to investigators on March 8, 2007.

At trial, Appellant sought unsuccessfully to suppress his statement to NCIS asserting that the waiver of his rights was not knowing and intelligent and therefore invalid because of his delusional state at the time. During the merits phase of the trial, the defense called two forensic psychiatrists who testified regarding their evaluations of Appellant and the delusional system Appellant had built around himself at the time of the offense. Each adhered to his view that because of Appellant's severe paranoid schizophrenia, Appellant did not appreciate the wrongfulness of his actions at the time. One psychiatrist, Dr. Simmer, testified that he was aware that five other mental health professionals, besides himself, had examined Appellant, and that he was not aware that any of them had returned findings inconsistent with his own.

Appellant's defense at trial was lack of mental responsibility, and the military judge instructed on this affirmative defense.[3] During deliberations, one of the members

---

[3] The military judge gave the following instruction:

> There are indications from the evidence that you are required to decide the issue of the accused's sanity at the time of the offense.
>
>   . . . .

specifically asked, "What is the legal definition of 'wrongfulness of his conduct?'" Over defense objection, the military judge instructed the members as follows:

> If the accused was able to appreciate the nature, and quality, and the wrongfulness of (his) conduct, (he) is criminally responsible; and this is so, regardless of whether the accused was then suffering from a severe mental disease or defect, <u>and regardless of whether or not (his) own personal moral code was violated by the commission of the offense.</u>
>
> . . . .
>
> When the law speaks of wrongfulness[,] the law does not mean to permit the individual to be his own judge of what is right or wrong. <u>What is right or wrong is judged by societal standards.</u> The standard focuses on the accused's ability to appreciate that his conduct would be contrary to public or societal standards.

---

> The accused is presumed to be mentally responsible. . . .
>
> If you determine that, at the time of the offenses . . . the accused was suffering from a severe mental disease or defect, then you must decide whether, as a result of that severe mental disease or defect, the accused was unable to appreciate the nature and quality or wrongfulness of his conduct.
>
> If the accused was able to appreciate the nature and quality or the wrongfulness of his conduct, he is criminally responsible; and this is so regardless of whether the accused was then suffering from a severe mental disease or defect.
>
> On the other hand, if the accused had a delusion of such a nature that he was unable to appreciate the nature and quality or wrongfulness of his acts, the accused cannot be held criminally responsible for his acts, provided such a delusion resulted from a severe mental disease or defect.

Emphasis added. Defense counsel argued at trial that "the accused not being able to appreciate it as contrary to public or societal standards, is not the same thing as the accused not realizing other people may perceive it as wrong." Similarly, before this Court, Appellant asserts that the instruction given by the military judge provided a purely objective standard for wrongfulness. He urges this Court to adopt a standard that incorporates the subjective beliefs of the accused in determining wrongfulness.

## DISCUSSION

### I. Jury Instructions on Wrongfulness

The affirmative defense of lack of mental responsibility requires the accused to prove, by clear and convincing evidence, that at the time of the offense, (1) the accused suffered from a "severe mental disease or defect," and (2) as a result of that mental disease or defect, the accused was "unable to appreciate" either (a) the "nature and quality" of his acts, or (b) the "wrongfulness" of his acts. Uniform Code of Military Justice, Article 50a, UCMJ, 10 U.S.C. § 850a(a) (2006). Article 50a, UCMJ, is "substantively identical" to the federal civilian insanity defense, enacted in the Insanity Defense Reform Act of 1984 (IDRA), Pub. L. No. 98-473, sec. 402, § 20, 1837, 2057 (codified as amended at 18 U.S.C. § 17 (2006)).

United States v. Mott, No. 12-0604/NA

This Court previously considered the insanity defense in United States v. Martin, 56 M.J. 97 (C.A.A.F. 2001).  As noted in Martin, the terms "nature and quality" and "wrongfulness" were part of the insanity test laid out in M'Naghten's Case, (1843) 8 Eng. Rep. 718 (H.L.):

> [T]o establish a defence on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong.

8 Eng. Rep. at 722 (emphasis added).  In Martin, 56 M.J. at 108, this Court favorably cited the following explanation of "nature and quality" and "wrongfulness":

> The first portion relates to an accused who is psychotic to an extreme degree.  It assumes an accused who, because of mental disease, did not know the nature and quality of his act; he simply did not know what he was doing.  For example, in crushing the skull of a human being with an iron bar, he believed that he was smashing a glass jar.  The latter portion of M'Naghten relates to an accused who knew the nature and quality of his act.  He knew what he was doing; he knew that he was crushing the skull of a human being with an iron bar.  However, because of mental disease, he did not know that what he was doing was wrong. He believed, for example, that he was carrying out a command from God.

2 Charles E. Torcia, Wharton's Criminal Law § 101, at 17 (15th ed. 1994).

However, in enacting the IDRA and Article 50a, UCMJ, Congress sought to broaden the insanity defense test from

9

M'Naghten's "know" to the Model Penal Code's "appreciate." See Martin, 56 M.J. at 107-8; United States v. Meader, 914 F. Supp. 656, 658 n.2 (D. Me. 1996);[4] United States v. Freeman, 357 F.2d 606, 623 (2d Cir. 1966) ("The choice of the word 'appreciate,' rather than 'know' in the first branch of the test also is significant; mere intellectual awareness that conduct is wrongful, when divorced from appreciation or understanding of the moral or legal import of behavior, can have little significance.").

The UCMJ does not define "wrongfulness of the acts." The meaning of appreciating "wrongfulness" was analyzed at length in the original M'Naghten's Case and analyzed more recently in the

---

[4] As explained in Meader:

> Congress adopted the language of the Model Penal Code rather than the M'Naghten rule ("appreciate" vs. "know") and thereby broadened the inquiry. Model Penal Code § 4.01 comment 2 at 166 ("Know" leads to an excessively narrow focus on "a largely detached or abstract awareness that does not penetrate to the affective level."); S. Rep. No. 307, 97th Cong., 1st Sess. 100-01 (1981) (Model Penal Code "uses the more affective term 'appreciate' for the more coldly cognitive 'know' of M'Naghten."), referred to in S. Rep. No. 225, 98th Cong., 2d Sess. (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3404 n.1; accord ABA Criminal Justice Mental Health Standards 7-6.1 at 343-44 (1989).

914 F. Supp. at 658 n.2.

context of the IDRA in United States v. Ewing, 494 F.3d 607 (7th Cir. 2007).  Like the court in Ewing, we infer that wrongfulness carries the same meaning in the IDRA and Article 50a, UCMJ, as in M'Naghten's Case and its accompanying common law.  See 494 F.3d at 618; NLRB v. Amax Coal Co., 453 U.S. 322, 329 (1981) ("Where Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.").

In M'Naghten's Case, the judges of the Queen's Bench responded to the questions of the House of Lords about insanity and mental responsibility for criminal conduct.  The judges explained that the jury should determine whether, at the time of committing the alleged act, the accused "knew the difference between right and wrong . . . in respect to" the charged act.  8 Eng. Rep. at 722-23.  The jury instruction is for knowing "right and wrong" rather than knowing that the act violates the law, so as to not confuse the jury by suggesting that the accused must have "actual knowledge of the law of the land."  Id. "Wrongfulness" in the context of the M'Naghten rule thus has two components:  (1) that "the accused was conscious that the act was one which he ought not to do," and (2) that the "act was at the same time contrary to the law of the land."  Id.  As Ewing explains, the "relevant inquiry . . . was not a defendant's

11

actual knowledge of the criminal law under which he was accused, but rather whether the defendant understood the difference between right and wrong." Ewing, 494 F.3d at 619. In short:

> M'Naghten's Case demonstrates that "wrongfulness" is substituted for "criminality" not to create two (or more) distinct moral codes by which a defendant's conduct could be judged, but rather to ensure that the inquiry remains focused on a defendant's ability to understand wrongfulness, rather than his actual knowledge of the law.
>
> Id. at 620 n.6.

The M'Naghten court also considered the effect of delusions on mental responsibility. The court explained that a person under the influence of a delusion "must be considered in the same situation as to responsibility as if the facts with respect to which the delusion exists were real." 8 Eng. Rep. at 723. For example:

> [I]f under the influence of his delusion he supposes another man to be in the act of attempting to take away his life, and he kills that man, as he supposes, in self-defence, he would be exempt from punishment. If his delusion was that the deceased had inflicted a serious injury to his character and fortune, and he killed him in revenge for such supposed injury, he would be liable to punishment.

Id.

On appeal, Appellant challenges the military judge's instructions to the members regarding the meaning of "wrongfulness" for purposes of the defense of lack of mental responsibility. Appellant urges us to find that "wrongfulness"

in Article 50a, UCMJ, means a subjective wrongfulness as determined by the accused's sense of right and wrong. Appellant finds support in two federal appellate cases -- one of which was written before the adoption of the IDRA and the other relying heavily on the former. See United States v. Segna, 555 F.2d 226, 232-33 (9th Cir. 1977) (describing three interpretations of wrongfulness as (1) "legally wrong, or contrary to law," (2) "contrary to public morality," and (3) "subjective" or "contrary to one's own conscience," and adopting the third "subjective" test (internal quotation marks omitted)); United States v. Dubray, 854 F.2d 1099, 1101 (8th Cir. 1988) ("Dubray asked that the jury be instructed that 'wrongfulness' implies moral, rather than criminal, wrongdoing, and proposed the verdict director drawing this distinction discussed in [Segna]. Like the Ninth Circuit, our Court recognizes that a defendant's delusional belief that his criminal conduct is morally justified may establish an insanity defense under federal law, even where the defendant knows that the conduct is illegal.").

"Whether a panel was properly instructed is a question of law" which we review de novo. United States v. Garner, 71 M.J. 430, 432 (C.A.A.F. 2012) (quoting United States v. Ober, 66 M.J. 393, 405 (C.A.A.F. 2008) (internal quotation marks omitted).

As in M'Naghten's Case, courts examining the issue since the enactment of the IDRA and Article 50a, UCMJ, have found that

13

"wrongfulness" should be determined using an <u>objective</u> standard. See, e.g., <u>United States v. Ewing</u>, 494 F.3d 607, 621 (7th Cir. 2007) ("We conclude that wrongfulness for purposes of the federal insanity defense statute is defined by reference to objective societal or public standards of moral wrongfulness, not the defendant's subjective personal standards of moral wrongfulness."); <u>United States v. Cuebas</u>, 415 F. App'x 390, 396-97 (3d Cir. 2011) (unpublished) ("The term 'wrongful' means contrary to or against generally-accepted standards of right and wrong . . . . 'Evidence that the defendant knew and understood that his conduct was against the law may be considered . . . in determining whether the defendant appreciated that his conduct was contrary to public morality.'"); <u>State v. Singleton</u>, 48 A.3d 285, 295-96 (N.J. 2012) ("[A] majority of states following the <u>M'Naghten</u> test have interpreted 'wrong' as encompassing legal as well as moral wrong."); <u>People v. Serravo</u>, 823 P.2d 128, 137 (Colo. 1992) (en banc) ("We believe that the better reasoned interpretation of 'wrong' in the term 'incapable of distinguishing right from wrong' refers to a wrongful act measured by societal standards of morality."); <u>see also</u> <u>State v. Crenshaw</u>, 659 P.2d 488, 493 (Wash. 1983) ("[I]n discussing the term 'moral' wrong, it is important to note that it is society's morals, and not the individual's morals, that are the standard for judging moral wrong under <u>M'Naghten</u>."); <u>State v. Hamann</u>, 285

14

N.W.2d 180, 183 (Iowa 1979) ("Those states which believe the right or wrong test should be conducted with a view to moral right or wrong are quite uniform in rejecting a subjective test."); State v. Corley, 495 P.2d 470, 473 (Ariz. 1972) ("We find no authority upholding the defendant's position that one suffering from a mental disease could be declared legally insane if he knew that the act was morally and legally wrong but he personally believed that act right."); People v. Rittger, 355 P.2d 645, 653 (Cal. 1960) ("The fact that a defendant claims and believes that his acts are justifiable according to his own distorted standards does not compel a finding of legal insanity. This is necessarily so if organized society is to formulate standards of conduct and responsibility deemed essential to its preservation or welfare, and to require compliance, within tolerances, with those standards.").

Society formally expresses its determinations of "right and wrong" and "public morality" through law. See State v. Worlock, 569 A.2d 1314, 1321 (N.J. 1990) ("Law is largely the crystallization of societal morals. Rarely would an allegedly illegal act not also be wrongful morally."). Thus, wrongfulness is based on the law, even if it does not require the accused to have actual knowledge of the law.[5] While "appreciate" is

---

[5] The Supreme Court of New Jersey in Worlock and other courts have considered whether there is a difference between legal and

subjective, "wrongfulness" must be objective.  Cf. State v.

Cole, 755 A.2d 202, 210-11 (Conn. 2000) (noting that the issue

in the case was not whether the homicide was wrongful, but

rather whether the accused failed to understand it to be

wrongful).  Thus, "appreciating wrongfulness" is the accused's

ability to understand and grasp that his conduct violates

society's essential rules, and is supported by an accused's

understanding that his conduct violated the law, and is

contradicted by evidence that -- if the facts of the accused's

delusions were true -- then his conduct would not violate the

law.

Therefore, like the majority of federal and state appellate

courts who have addressed the issue, we adopt an "objective"

standard for determining "wrongfulness"[6] in the context of

_____

moral wrong for the purpose of applying the insanity defense.
569 A.2d at 1320-21; see also People v. Schmidt, 110 N.E. 945,
949-50 (N.Y. 1915).  The Worlock court concluded that the only
generally recognized distinction is the "command from God"
exception.  569 A.2d at 1321.  However, like the Worlock court,
we need not ultimately define the distinction, if any, between
legal and moral wrong, as in this case Appellant argued that he
acted in perceived self-defense, and that Appellant's mental
illness prevented him from appreciating that the attempted
killing was wrongful in any sense.

[6] While the issue on appeal in this case is the standard for
"wrongfulness," it is important to note that the defense of
mental responsibility turns on the accused's ability to
appreciate the nature and quality or wrongfulness of his
actions.  See Martin, 56 M.J. at 107-09.  Thus while
wrongfulness is determined objectively, the determination of the

16

Article 50a, UCMJ. Thus, the military judge correctly instructed the members when he stated that wrongfulness "is judged by societal standards," rather than the accused's "own personal moral code," and that the "standard focuses on the accused's ability to appreciate that his conduct would be contrary to public or societal standards." We hold that the military judge did not err in providing an objective standard for wrongfulness in his jury instructions regarding the affirmative defense of lack of mental responsibility.

II. Knowing and Intelligent Waiver

The issue here is whether Appellant knowingly and intelligently waived his Fifth Amendment and Article 31, UCMJ, rights to counsel. Appellant argues that Appellant's severe mental disease prevented him from knowingly and intelligently waiving his right to counsel. The Government argues that the evidence shows by a preponderance of the evidence that Appellant sufficiently understood his rights at the time of the waiver. Without deciding whether Appellant knowingly and intelligently waived his right to counsel, we hold that the military judge abused his discretion by failing to analyze as a matter of law whether Appellant could and did knowingly and intelligently waive his rights. Colorado v. Connelly, 479 U.S. 157, 168,

---

accused's ability to "appreciate" that wrongfulness is necessarily specific to that accused.

17

(1986), focuses on whether a statement is voluntary and in particular the product of police coercion, which the military judge addressed.  Edwards, however, requires that a waiver of rights be knowing and intelligent, and not merely voluntary. See 451 U.S. at 484.

## A.  Appellant's Suppression Hearing

Before trial, Appellant moved to suppress the statement he gave to NCIS.  At the ensuing hearing, the Government called Special Agent Jonathan Oakes, one of two NCIS agents who took Appellant's statement.  The defense called Dr. Sadoff, a psychiatrist who had reviewed Appellant's history and was recognized by the court as an expert in forensic psychiatry. The court also considered Appellant's signed statement, waiver of rights form, and the video from the last hour and fifteen minutes of the four-and-a-half-hour interrogation.[7]

### 1.  Special Agent Oakes's Testimony

Oakes testified that he interviewed Appellant with another unarmed agent in an NCIS office.  Appellant signed the standard rights waiver form.  Oakes interviewed Appellant, then typed Appellant's statement and let Appellant review the statement. Appellant reviewed the statement and made some changes.  The

---

[7] Appellant arrived at the interview room at 11:00 a.m. and was advised of his rights at 12:10 p.m.  NCIS did not start recording the interview until over three hours later, at 3:36 p.m., at which point most of the statement was already written. The video recording ends at 4:50 p.m.

18

statement followed a standard template.  Appellant appeared alert and sober, and was offered breaks and snacks.

Oakes testified that Appellant gave a number of bizarre statements during the interrogation.  For example, Appellant told the agents that when he was thirteen years old, Special Forces troops kidnapped him in the Bronx and broke his neck.  Appellant also described his connection to the terrorist Zacarias Moussaoui and claimed that he had spoken with Presidents Clinton and Bush.

Oakes did not believe Appellant's "bizarre" statements.  Oakes was not surprised when Appellant stated that he was of "sound mind and body," because Oakes had experience with mentally ill persons and understood that they sometimes do not recognize that they are ill.

When asked by defense counsel, Oakes at first denied that Appellant's interview was videotaped because of Appellant's bizarre statements and behavior, and instead attributed the videotaping to the "growing CSI effect."  On further probing, Oakes stated that at the time of Appellant's interview:  NCIS's policy was to not videotape interviews; that he had previously interviewed other suspects of aggravated assault and attempted murder; and that he had never -- in over two hundred suspect interviews -- recorded an interrogation other than that of Appellant.  In Appellant's case, Oakes was specifically

instructed by his supervisor to videotape part of the interview. The military judge found that "[t]he later portion of SN Mott's interrogation was recorded on video due to the bizarre nature of his initial statements."

2. Interrogation Statement and Video

In conjunction with Oakes's testimony, the Government presented Appellant's signed statement and the videotape of approximately one hour of Appellant's interrogation.

The statement described Appellant's account of the events leading up to the attack, the attack itself, the alleged rape by JG and others in 2003, and a previous unrelated alleged rape.[8] Appellant described hearing JG say "he was 'going to have to kill MOTT'" and his family. Appellant considered asking someone for a gun, but "thought it might cause a confrontation or someone would question why I wanted the gun." Instead, Appellant "purchased the knife for protection." Appellant saw JG again the next morning, poured a glass of water, approached JG, and stabbed him. The statement then describes Appellant's intent:

> When I heard [JG]'s voice, on 07Mar07, I immediately
> knew I wanted to kill him. I purchased the knife

---

[8] Appellant never "actually met or had dealings with the victim [JG] prior to the attack" on March 8, 2007. Mott, 2009 CCA LEXIS 424, at *4, 2009 WL 4048019, at *1 (N-M. Ct. Crim. App. Nov. 24, 2009). The rape delusion which Appellant tragically assigned to JG appears to be only one of several rape delusions that Appellant experienced.

knowing I wanted to kill him. When I was "hitting" [JG], I wanted him to die. If [JG] does not die, then he still will be a threat to my life. I believe this was divine intervention. God placed us on the ship together so justice could be served.

The statement devotes just as much space to meticulous descriptions of Appellant's perceived previous rapes. According to the statement, Appellant was with his girlfriend MQ in 2003 when she breathed a drug into him, "several unknown males (one of which being [JG]) jumped out of the closet," the males then "shoved an unknown liquid (contained in a zip-lock bag) and a powder (contained in a second bag) up my anus," turned the bags inside out, and then "cut inside my anus with small plastic pieces." The statement alleges that JG was part of a team of about fifteen people involved in the assault. The statement also describes a previous incident in which Appellant's girlfriend "drugged me with an unknown drug," Appellant "passed out," and during that time "unknown girls in the apartment were putting drugs up my ass, then removing them and selling them."

The video starts approximately three hours into the interrogation, after most of the statement was already written. The video also contains a number of extraordinary statements. In one exchange, Appellant asserts that he was looking into buying psychedelic mushroom spores so that he could give the mushrooms to a hospital. The agent responds that you cannot sell psychedelic mushrooms to a hospital, Appellant considers a

moment, and then responds that he will just build his own hospital then. Later, when the agent asks Appellant to confirm that the written statements are his thoughts, Appellant does not contest the account of the attempted murder but instead exhorts the agent, "Did we put the part in there about the bag?" When the agent asks if Appellant wanted to kill everyone involved in his alleged rape, Appellant considers the question and in seriousness notes that "I mean, everybody dies, unless they are immortal or something, which is a possibility," but that he wanted to see his assailants "killed or in jail forever." The agent suggests "brought to justice" and Appellant responds "that's even better." Appellant seemed to waver between whether he wanted JG dead, in jail, or simply no longer a danger to him. Appellant similarly wavered between whether, during the alleged 2003 rape by JG and others, JG and the other assailants had actually killed Appellant (he was later "zapped back up") or whether Appellant only feigned death.[9]

---

[9] The written statement also contradicts itself. At first, it states that Appellant "was able to fight [the assailants] off" and saw them leaving "because of a reflection in the mirror while crawling to the toilet." Later in the same paragraph, the statement indicates that "[JG] put a bag over my face during the incident and . . . I played dead until they left the room and then wiggled the bag off my head." Thus, Appellant apparently believed, at different times in the interview, that he had either: (1) fought off his attackers and seen them leaving; (2) played dead and once the assailants left removed the bag from his head; or (3) temporarily died.

3. Dr. Sadoff's Expert Opinion Regarding Waiver

Dr. Sadoff testified that Appellant was not competent to waive his right to remain silent:

> Q:  Now, Doctor, in your expert medical opinion, would Seaman Mott have been competent to understand the waiver of his rights to remain silent, and the full consequence of waiving those rights?
>
> A:  In my opinion, he would not have been because he was so psychotic with delusional carryover, and hallucinations that were ongoing at the time, that he [sic] could have prevented him from fully appreciating and understanding the implications and consequences of waiving his rights and making a statement.

Dr. Sadoff explained "competency" as:  a person who "knows and understands the nature and consequences of the legal situation in which he is involved, really, the consequences of making statements, appreciating them, from not only an intellectual, but also an emotional point of view."  While Appellant appeared to be acting logically, his psychotic state prevented him from emotionally appreciating what he was doing.  Moreover, while Appellant was able to answer questions, much of what Appellant said was "bizarre and delusional," "reflecting [the] hallucinations that [Appellant] was having."

Dr. Sadoff explained how psychosis affects a person's thinking.  According to Dr. Sadoff, psychosis affects how a person "intellectually, cognitively, and also emotionally" understands "everything that goes into the brain."  Dr. Sadoff testified that, as a result, "psychosis affects a person's

23

judgment, affects his thinking, [and] affects his reaction."
Dr. Sadoff explained that "[p]sychotic people have different
ways of looking at things, and they do things that may appear to
be logical but, in their own [mind] -- if you probe even
further, and get below the surface of that paralogic, I think
you will find a whole set of psychotic bizarre ideas."

With regard to Appellant in particular, the Government
asked Dr. Sadoff during cross-examination whether Appellant's
psychosis "prevent[ed] him from understanding the consequences
of waiving his rights to remain silent."  Dr. Sadoff testified
that "it did, because he was so certain about what he did and
why he did it, even though his reasons were based on psychotic
delusions and hallucinations."  Dr. Sadoff asserted that
Appellant's evolving and contradictory stated reasons for his
actions were not the result of an awareness of how his conduct
might be perceived, but rather are typical of psychotic persons
and "reflected [Appellant's] degree of confusion, and his
psychotic state of mind."  Dr. Sadoff concluded that "it was
[Appellant's] paranoia that caused him to make these
adjustments, not logical concern about how it would look."

On the other hand, Dr. Sadoff also testified that "even
people who are psychotic and paranoid have an awareness and an
intellectual ability to understand and be aware of the reality
of what they may do, and its effect on other people."  Thus,

24

even though Appellant was psychotic, Appellant knew that asking for a gun would raise suspicions.

## 4. Military Judge's Findings

In his ruling, the military judge did not address Dr. Sadoff's testimony, but apparently rejected it in finding (as a finding of fact, not law) that Appellant "knowingly, intelligently, and voluntarily waived his rights."  The military judge found that the "accused's memory and thought processes were functioning" during the interrogation and that "[t]he accused gave, although bizzare [sic] in content, logical answers to the questions that were asked."

## a. Abuse of Discretion

"We review a military judge's decision to deny a motion to suppress evidence -- like other decisions to admit or exclude evidence -- for an abuse of discretion."  United States v. Freeman, 65 M.J. 451, 453 (C.A.A.F. 2008) (citing United States v. Ayala, 43 M.J. 296, 298 (C.A.A.F. 1995)).  "An abuse of discretion occurs when the trial court's findings of fact are clearly erroneous or if the court's decision is influenced by an erroneous view of the law."  Freeman, 65 M.J. at 453 (citing United States v. Rader, 65 M.J. 30, 32 (C.A.A.F. 2007)).  "Further, the abuse of discretion standard of review recognizes that a judge has a range of choices and will not be reversed so long as the decision remains within that range."  United States

v. Gore, 60 M.J. 178, 187 (C.A.A.F. 2004). In certain cases, even when "the evidence in [the] record may well have supported the [military judge's] decision," the military judge may nonetheless have abused his discretion where the military judge's ruling was based on a "misapprehension of the applicable law" and the military judge's findings failed to address the relevant considerations. United States v. Cokeley, 22 M.J. 225, 229 (C.M.A. 1986).

b.  Right to Counsel

"[T]he accused's statement during a custodial interrogation[10] is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived Miranda rights."  Berghuis v. Thompkins, 130 S. Ct. 2250, 2260 (2010) (emphasis added) (internal quotation marks and brackets omitted); M.R.E. 305 (g)(1) (waiver of the right to counsel "must be made freely, knowingly, and intelligently"); see also United States v. Westmore, 17 C.M.A. 406, 409-10, 38 C.M.R. 204, 207-08 (1968) ("If the interrogation continues

---

[10] Consistent with our precedents, we note that in the military system the accused's right to counsel -- and the requirement of knowing and voluntary waiver -- are not limited to custodial interrogation.  See United States v. Delarosa, 67 M.J. 318, 320 (C.A.A.F. 2009) ("Military officials and civilians acting on their behalf are required to provide rights warnings prior to interrogating a member of the armed forces if that servicemember is a suspect, irrespective of custody.  Article 31(b), UCMJ, 10 U.S.C. § 831(b) (2000); Military Rule of Evidence (M.R.E.) 305(b)(1), 305(c).").

without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." (quoting Miranda v. Arizona, 384 U.S. 436, 475 (1966) (internal quotation marks omitted)). Voluntariness of consent and knowing waiver are two distinct and "discrete inquiries." Edwards v. Arizona, 451 U.S. 477, 484 (1981). Thus, in addition to showing that the waiver was "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," Thompkins, 130 S. Ct. at 2260 (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)) (internal quotation marks and brackets omitted), the government must also demonstrate that the accused "understood his right to counsel and intelligently and knowingly relinquished it." Edwards, 451 U.S. at 484.

The accused has to have "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Thompkins, 130 S. Ct. at 2260. However, "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." Colorado v. Spring, 479 U.S. 564, 574 (1987). In other words, the accused must "fully understand[] the nature of the right and how it would

27

likely apply <u>in general</u> in the circumstances -- even though the defendant may not know the <u>specific detailed</u> consequences of invoking it. A defendant, for example, may waive his right to remain silent . . . even if the defendant does not know the specific questions the authorities intend to ask." <u>United States v. Ruiz</u>, 536 U.S. 622, 629-630 (2002). The analysis should take into account the accused's "age, experience, education, background, and intelligence, and [his] capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." <u>Fare v. Michael C.</u>, 442 U.S. 707, 725 (1979). The government must show waiver by a preponderance of the evidence. <u>Thompkins</u>, 130 S. Ct. at 2261. (citing <u>Colorado v. Connelly</u>, 479 U.S. 157, 168 (1986)).

In sum, there are two branches to the waiver analysis. First, was the waiver voluntary? And, second, was the waiver knowing and intelligent? <u>Edwards</u>, 451 U.S. at 483-84. Mental illness does not make a statement involuntary per se. <u>See</u> <u>Connelly</u>, 479 U.S. at 170 (holding that the unprovoked confession of a schizophrenic experiencing command hallucinations by the "voice of God" was not involuntary). Voluntariness "depend[s] on the absence of police overreaching." <u>Connelly</u>, 479 U.S. at 170. Regardless of the accused's mental state, a confession will not be suppressed for involuntariness

absent "coercive police activity."  Id. at 167.  See also United States v. Campos, 48 M.J. 203 (C.A.A.F. 1998) (confession not involuntary where the accused was interrogated in the hospital and, unbeknownst to the officers, was under the influence of codeine).  If volition were the sole issue in this case, then Connelly would control.

Edwards clearly requires that the judge analyze whether the waiver was knowing and intelligent.  However, it is not clear in the context of mental illness what this really means.  While the Supreme Court and this Court have declined to find confessions involuntary absent government coercion, see Connelly, 479 U.S. at 167 (spontaneous confession of a psychotic experiencing command hallucinations); Campos, 48 M.J. at 204 (confession of accused under influence of codeine), neither has addressed the effect of mental illness on the requirement that waiver be knowing and intelligent.  See Campos, 48 M.J. at 207 n.1 ("We need not decide today whether a mentally impaired person can waive his or her rights under Article 31.").  Connelly explicitly did not address a situation in which the accused's mental illness affected his ability to understand his rights:

> Dr. Metzner testified that, in his expert opinion, respondent was experiencing "command hallucinations." This condition interfered with respondent's "volitional abilities; that is, his ability to make free and rational choices."  Ibid.  Dr. Metzner further testified that Connelly's illness did not significantly impair his cognitive abilities.  Thus,

> respondent understood the rights he had when Officer
> Anderson and Detective Antuna advised him that he need
> not speak.

479 U.S. at 161 (emphasis added) (citations omitted).  Nor did

Connelly address situations where the police know the defendant

is mentally ill.  See 479 U.S. at 161 (neither police officer

"perceived [any] indication whatsoever that respondent was

suffering from any kind of mental illness").

The military judge's analysis does not address the issue of

knowing and intelligent waiver, but rather focuses solely on the

question of voluntariness.  This is despite the fact that

Appellant's suppression motion was based on knowing and

intelligent waiver, and not voluntariness.  The ruling, for

example, states that Appellant moved to suppress his statements

"because the accused was mentally ill at the time of the

statements, making them involuntary."  The only mention of

knowing and intelligent waiver in the ruling appears in the

findings of fact, which concluded that "[t]he accused knowingly,

intelligently, and voluntarily waived his rights."  Thus, the

findings do not address the uncontested expert testimony.  In

fairness, the Edwards test as applied in the context of mental

illness has not been articulated in military jurisprudence.  The

military judge did find a number of facts that would support a

legal finding of knowing and intelligent waiver;[11] however, these facts were not discussed or explicitly analyzed and applied to a finding of law.

As a result, the military judge abused his discretion in his analysis. The military judge did not apply the Edwards framework, which requires a separate analysis of voluntary waiver and knowing and intelligent waiver. As stated in Edwards:

> [I]n denying petitioner's motion to suppress, the trial court found the admission to have been "voluntary" without separately focusing on whether [Appellant] had knowingly and intelligently relinquished his right to counsel. . . . Here, however sound the conclusion of the state courts as to the voluntariness of [Appellant's] admission may be, . . . the trial court . . . [did not] undert[ake] to focus on whether [Appellant] understood his right to counsel and intelligently and knowingly relinquished it. It is thus apparent that the decision below misunderstood the requirement for finding a valid waiver of the right to counsel . . . .

Edwards, 451 U.S. at 483-84.

The military judge also erred when he addressed whether Appellant's waiver was knowing and intelligent solely as a conclusory finding of fact, rather than as a conclusion of law.

---

[11] For example, the military judge found that "it was clear to the court that the accused understood the consequences of talking to the agents," and that "[i]t was very clear that the accused contemplated how what he said in his written statement and how it was recorded in his written statement would be perceived by others and how it would affect his future and the handling of any charges."

See United States v. Freeman, 65 M.J. 451, 453 (C.A.A.F. 2008)
(citing Arizona v. Fulminante, 499 U.S. 279, 287 (1991)).

Moreover, while there were facts that supported a finding
of knowing and intelligent waiver, the military judge did not
address how the accused's waiver was knowing and intelligent in
the context of:  (1) the Edwards requirement of distinct
inquiries into both knowing and voluntary waiver, 451 U.S. at
483-84, and Connelly's limited holding as applying only to
voluntariness, 479 U.S. at 164; (2) the uncontested testimony of
the sole expert witness that Appellant's mental illness
prevented him from understanding his rights, (3) the R.C.M. 706
board's conclusion, only a few weeks after Appellant's
interrogation, that Appellant suffered from severe paranoid
schizophrenia and was not competent to understand the nature of
the proceedings against him, cf. Connelly 479 U.S. at 173
(Stevens, J., concurring in the judgment in part and dissenting
in part) ("Since it is undisputed that respondent was not then
competent to stand trial, I would also conclude that he was not
competent to waive his constitutional right to remain silent.");
and (4) Appellant's persecutory delusions, including the
"grandiose paranoid ideation" that Appellant would go to jail
for nine years and serve six, just as he believed that Andrew
Carnegie had done.

United States v. Mott, No. 12-0604/NA

We find that the military judge abused his discretion by not separately analyzing whether Appellant's waiver was knowing and intelligent. Therefore, we do not reach a conclusion as to whether the confession in this case could be admissible -- only that it was not properly admitted in this case.

We now review whether the erroneous admission of Appellant's confession was harmless beyond a reasonable doubt.

III. Harmless Error

Constitutional errors are reviewed for harmlessness beyond a reasonable doubt. United States v. Paige, 67 M.J. 442, 449 (C.A.A.F. 2009) (constitutional error affecting accused's affirmative defense reviewed for harmlessness beyond a reasonable doubt). The admission of the statement and interrogation video are not harmless beyond a reasonable doubt if "'there is a reasonable possibility that the evidence complained of might have contributed to the conviction.'" United States v. Moran, 65 M.J. 178, 187 (C.A.A.F. 2007) (quoting Chapman v. California, 386 U.S. 18, 24 (1967)). "This determination is made on the basis of the entire record, and its resolution will vary depending on the facts and particulars of the individual case." United States v. Sweeney, 70 M.J. 296, 306 (C.A.A.F. 2011) (quoting United States v. Blazier, 69 M.J. 218, 226-27) (C.A.A.F. 2010).

33

Erroneous admission of a confession "requires a reviewing court to exercise extreme caution before determining that the admission of the confession at trial was harmless."  Arizona v. Fulminante, 499 U.S. 279, 296; see also id. ("[T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct . . . . [A] full confession in which the defendant discloses the motive for and means of the crime may tempt the jury to rely upon that evidence alone in reaching its decision."); United States v. Ellis, 57 M.J. 375, 381 (C.A.A.F. 2002) ("[T]he defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.").

We find that the improper admission of Appellant's statement and interrogation was not harmless beyond a reasonable doubt due to its potential effect on Appellant's affirmative defense of not guilty by reason of insanity.  The Government relied on Appellant's statement to show that Appellant, though severely mentally ill, appreciated the wrongfulness of his actions.  As demonstrated by the Government's closing argument, trial counsel used Appellant's statement extensively to support the theory that Appellant intended to kill JG out of revenge, not self-defense.

The Government's closing slide presentation clearly and visually demonstrated trial counsel's extensive use of Appellant's statement.  For example, trial counsel's first slide, titled "Revenge – Justice," quotes Appellant's statement in bold letters:

- **"I poured myself a drink of water, then walked over to [JG] from behind to kill him.  I took out my knife from my pocket, opened it, and placed it in my right hand to cut [JG].** (Acc hand-wrote) **I wanted justice upheld and knew I was the one to do it because he raped me."** (acc stmt)

- **"God placed us on the ship together so justice could be served"**. (acc stmt)

Appellant quotes the same statement in the slide addressing the Appellant's appreciation of the wrongfulness of his acts.

The Government's closing argument repeatedly exhorted the members to look at Appellant's statement and video.  See, e.g., Record at 527, United States v. Mott, __ M.J. __ (C.A.A.F. 2013 (No. 12-0604) ("Revenge and justice.  You heard directly from the accused's statements that this is what he sought with the attack of Seaman Recruit JG.  The first statement from the accused's hand-written statement, describing exactly what he did . . . . "); id. ("And then, members, remember, and you have copies of the statement, he hand-wrote . . . ."); id. at 538 ("He wasn't completely out of his mind.  He read that statement. He agreed to that statement, and you saw that yourself, in the video."); id. at 539 ("It's in the video, members, and you can

watch that again."); id. at 540 ("Again, he never mentioned to NCIS that he was acting out of self-defense.  Look at his words again, justice, and knowing he wanted to kill him.  There's no self-defense in there.  And again, those statements were taken the day that the attack happened."); id. at 558 ("Look through this statement, and look through the video, because, yeah, he doesn't say 'self-defense' . . . .").

We find that there is "a reasonable possibility" the inclusion of Appellant's statement might have prejudiced Appellant's affirmative defense.[12]  See Moran, 65 M.J. at 187. We reach this conclusion because arguably the statement contradicted Appellant's theory that Appellant was unable to appreciate the wrongfulness of his actions.  Under the defense theory, Appellant's schizophrenia not only made him think that JG was the gang leader who previously raped and tried to kill him and now was back to kill him, but also that he faced imminent death and had no option but to kill JG.  Even if a rational person would have understood that he could report JG to the authorities or run away, Appellant asserted that he was

---

[12] As noted above, the effect of a constitutional error on an accused's affirmative defense is reviewed to see if the error was harmless beyond a reasonable doubt.  See United States v. Paige, 67 M.J. 442, 451 (C.A.A.F. 2009).

unable to process these options like a rational person,[13] and therefore was unable to appreciate that he was not acting in self-defense by attacking JG -- that is, Appellant was unable to appreciate that attacking JG was wrongful. Without Appellant's statement, the Government still could argue based on the R.C.M. 706 board's finding that Appellant believed he would go to jail (suggesting appreciating wrongfulness); and that Appellant did not face imminent attack (suggesting wrongfulness); and that Appellant screamed "you raped me" and not "you won't kill me" (suggesting Appellant's actions were not in self-defense). However, the strongest Government argument and central trial theory of revenge is significantly weakened.

There is clearly a "reasonable possibility that the evidence complained of," here Appellant's confession, "might have contributed to [Appellant's] conviction." See United States v. Paige, 67 M.J. 442, 451 (C.A.A.F. 2009) (quoting Moran, 65 M.J. at 187. Therefore, the erroneous admission of Appellant's statement was not harmless.

---

[13] Moreover, defense counsel argued that Appellant's previous complaints to the authorities had only drawn scorn and derision and therefore reporting JG to his superiors would not help his situation, and that since Appellant believed God to have put him on the ship with JG, it would be futile to run. This argument is consistent with the findings of the R.C.M. 706 board.

United States v. Mott, No. 12-0604/NA

DECISION

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is reversed.  The findings of guilty and the sentence are set aside.  The record of trial is returned to the Judge Advocate General of the Navy for remand to an appropriate convening authority.  A rehearing is authorized.