# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
PENLAND, MORRIS, and ARGUELLES[1]
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Private First Class JOHN K. JARLEGO**
**United States Army, Appellant**

ARMY 20210389

Headquarters, Fort Bliss (trial)
Headquarters, U.S. Army Combined Arms Center and Fort Leavenworth (rehearing)
Robert L. Shuck and Jeffery W. Hart, Military Judges (trial)
J. Harper Cook, Military Judge (rehearing)
Colonel Andrew M. McKee, Staff Judge Advocate (trial)
Colonel Robert L. Manley III, Staff Judge Advocate (rehearing)

For Appellant: Captain Tumentugs D. Armstrong (argued); Colonel Michael C. Friess, JA; Major Joyce C. Liu, JA; Captain Carol K. Rim, JA; Mr. Jonathan F. Potter, Esquire (on brief); Lieutenant Colonel Dale C. McFeatters, JA; Major Joyce C. Liu, JA; Captain Carol K. Rim, JA (on reply brief); Captain Louis S. Steiner, JA (argued); Lieutenant Colonel Autumn R. Porter, JA; Major Bryan A. Osterhage, JA (on rehearing brief); Colonel Phillip M. Staten, JA; Lieutenant Colonel Autumn R. Porter, JA; Jonathan F. Potter, Esquire; Major Byran A. Osterhage, JA (on rehearing reply brief).

For Appellee: Major Joseph H. Lam, JA (argued); Colonel Christopher B. Burgess, JA; Major Joseph H. Lam, JA; Captain Cynthia A. Hunter, JA (on brief); Captain Andrew T. Bobowski, JA (argued); Colonel Richard E. Gorini, JA; Major Lisa Limb, JA; Captain Vy T. Nguyen, JA (on rehearing brief).

30 July 2025

------------------------------------------------------------
MEMORANDUM OPINION ON FURTHER REVIEW
------------------------------------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

PENLAND, Senior Judge:

---

[1] Judge ARGUELLES decided this case while on active duty.

This Court reviewed appellant's first general court-martial in *United States v. Jarlego*, 2023 CCA LEXIS 388 (Army Ct. Crim. App. 11 Sep. 2023) (mem. op.) and set aside the findings and sentence. Contrary to appellant's pleas on rehearing, a military judge convicted him of three specifications of Article 120b, Uniform Code of Military Justice, 10 U.S.C. § 920b, [UCMJ], and then sentenced him to a dishonorable discharge, forty-two months of confinement, and reduction to the grade of E-1. We review the rehearing under Article 66, UCMJ.

The military judge erred in denying a defense motion to suppress, where a law enforcement agent obtained appellant's confession in violation of the fifth Amendment and Article 31, UCMJ. The government has not demonstrated a lack of prejudice, and we set aside the result.[2]

## BACKGROUND

The government's evidence was straightforward and brief, consisting of messages recovered from appellant's and the victim's phones, the victim's birth certificate establishing her age (under twelve) at the time of the offenses, and appellant's video-recorded confession to an Army Criminal Investigation Command (CID) special agent. The defense moved to suppress the confession in a timely pretrial motion, which the military judge denied, and appellant assigned error.

### A. Appellant's Confession

We have carefully reviewed the entire video recording of appellant's CID interview, which began, in pertinent part, when an unidentified man in civilian clothes (not the agent who interrogated appellant) opened the door to an empty room while appellant stood beside him. The man directed appellant to a specific chair and told him to sit down. As appellant walked to the chair, the man asked him if he needed the latrine or anything else. Appellant indicated no and continued moving to the chair. The man told him again to "just have a seat," and he closed the door behind him, leaving appellant seated alone.

The agent entered several minutes later, introduced himself, and began what he later testified was "rapport building" with appellant. Early on, the agent gestured with his clipboard and said:

> Before I can talk to you about anything, I have to fill out this questionnaire. They call it an administrative data sheet, but it's basically 114 questions that tells me what your name is, how tall you

---

[2] We have carefully considered appellant's other assigned and personally asserted matters; they merit neither discussion nor relief.

are, if you like long walks on the beach, and stuff like that. So I try not to ask all 114 questions. I just try to get through it as quickly as possible. I'm just going to ask the stuff that I need to ask, and then we'll get on with it, OK. Do you have any questions for me before we start – other than you're probably wondering why you're here? I can walk you through that.

So basically, what happened is—is there is a girl – her name is [victim's first name] . . . I do terrible with Hispanic names, man, God awful. But, she's been making, she's made allegations against a handful of soldiers like yourself that we've had to bring in and speak with so I just want, basically all we're doing is we're bringing you — we're bringing the other guys in and we just want to understand what the relationship was with this girl because the stuff that she's saying is kind of weird, right.

So, all I want to do is we'll get through this form, and I just want to talk to you about, if – do you know who that is?

Appellant responded, "Yeah – I've got an idea."

The agent continued, asking appellant various questions about his background and life experiences. The agent did most of the talking about a variety of topics: dangers of electricity, marital experiences, military occupational specialties, reenlistment prospects, future military operations, and opportunities for single soldiers. The agent offered his own story about joining the Army and his initial duty as an Explosive Ordnance Disposal technician, then his movement to CID:

I had an interaction with CID where I didn't feel like the CID agent that was talking to me, . . . I didn't feel like he was giving me a fair shake and I felt like he was being an asshole . . . . So once we got that worked out and everyone else felt like he was being an asshole, too . . . I want to be a CID agent, so I went through the process of doing that . . . . I see it all the time here . . . people have this misunderstanding of what CID actually does. And it's really not that complicated once it's explained to people.

My only job is to talk to people – that's it. I never went to law school, I would be the worst lawyer of all time. My job is really just talking and to get the facts out there . . . especially in 2019 and especially in the Army, what's the Army's biggest mission right now . . . the thing that they're most focused on? [Sexual Harassment/Assault Response and Prevention (SHARP)] . . . how many SHARP meetings do you have a month . . . probably like once a day. If it's not a meeting it's your

platoon sergeant saying . . . don't do something stupid . . . . The Army has engrained SHARP so much that it's become counterproductive in a way where no one takes the time to actually find the facts and find what actually happened.

Because most of the time what actually happened isn't what's initially reported at all, which is, one of the reasons that we brought you in here . . . . The other six guys as well in here, that have talked to this girl, because what do you think is more likely? The six or - with you - seven guys that I talk to and tell me something, or the one person who says something? Who's really being honest there? Does that make sense? And that's one thing that I try to do, because I've been on the other side of it. Where the agent is telling me, . . . "Why would I believe you?" Why would you not believe me. First of all this is f***in' America, so you believe me . . . . Most people aren't raised with the intention of lying. How often did you lie to your parents growing up? Every now and then, right? Sometimes pretty commonly, depending on what age you are, but when you lied to them . . . .

When you lied to your parents . . . cause you were scared right? Most people are scared to lie. People do it . . . .

Most people will tell the truth . . . and the problem that I have with the Army whatever it's investigations is . . . . people a lot of times assume that people are lying . . . . [l]et's say – do you guys have formation in the morning . . . ? You text your squad leader and say . . . I had to go to the hospital . . . . What's the first thing he asks you? . . . . He's not just gonna take your word for it. He's either going to come to the hospital and check on you . . . . A lot of people don't take people at face value, which I think is wrong and something that I made one of my goals . . . . She has no reason, they had no reason to lie . . . .

Something that I'm trying to impart on people – sometimes it's hard – I can't tell a colonel what to do, or I can but he won't listen. I just try to always . . . give people the opportunity who want to speak out, give them the opportunity to tell what happened from their point of view, because–let's say you and I step out of this room and someone asks you, "Hey [appellant], what happened while you were talking to [the agent]?" And they say, "[Agent], what happened while you were talking to [appellant]?" We're going to have two different perspectives on it, right? You're sitting on that side of the room. I'm sitting on this side of the room. You don't know that there's a fly flying around behind your head, so you would never . . . you're never going to mention the fly, because you never saw it. Does that make sense?

So . . . the most important thing in life in general is to get every perspective that you can, because one person's perspective isn't the perspective that everyone else in that area has. Does that make sense, man?

So I don't have any more questions . . . do you have any more questions for me before we . . . move on, or anything you want to talk about?

Appellant responded, "Yeah, this girl, what'd she say, like . . . ?

The agent said:

So, here's what happened. The girl that I mentioned, I'm not going to try to say and slaughter her name again. Her last name is [victim's last name] and she told us, and granted, she just told us this, that she met you on Snapchat along with a handful of other guys. Do you have a Snapchat? I assume – I have Snapchat. My mom has a Snapchat. Everybody has Snapchat . . . . So, do you recall meeting girls on Snapchat at all?

Appellant responded. "Yes."

The agent asked: "What are their names?"

Appellant responded with two names, and the agent asked if he knew their Snapchat usernames. Appellant indicated he did not. The agent continued:

Umm . . . so here's the thing, so I can't talk to you [pulled a document from papers on his clipboard] – so, because we live in America, and America is probably the greatest country on earth - pretty close, if it's not it's definitely in the top three [moving toward a table shared with appellant and referring to his clipboard documents]. So, the form I'm going to go over with you, it's called a rights warning form. It's what you see people do on TV all the time, where they're like, 'You have a right to a lawyer–.' And they go through it – they tell me that I can't memorize it, that I have to read off this paper, so we have to read off this paper. And, the reason is in the Army the Army says you cannot ask a Soldier, regardless – [moving to touch the nametape area of appellant's uniform] I'm going to fix your nametape real quick – I apologize, it was bugging me. The Army says you cannot ask a soldier any questions without advising them and giving them their rights that they're due first. Does that make sense?

> So, I can't ask you a single question about it until I go over this form, okay? And, the only thing they ask is when we go over the form, give me the opportunity to walk you through it. And then just think about giving me the opportunity to explain the situation in its entirety to you, okay? Umm, because I think once we get through this form, if you agree to talk with me today, I really think that once we get the facts out there – just like with the other six guys that came in and talked to us – *I think your facts are going to line up with theirs, and I think it's going to be beneficial, okay?*

(emphasis added). Appellant responded, "All right."

The agent then gave appellant a pen and moved next to him to review what appeared to be a rights warning document. The agent started on the form:

> So, I'm going to go over this. If at any point you have any questions, stop me and I'll answer any questions I can. If you feel like, "Hey, [agent], you're a f****** dummy, you can't answer my question." There might be someone smarter than me in this building, I'm not sure [chuckles], we'll find someone that can answer it, okay? . . .
>
> I want to question you about the following offenses of which you are – right here I need you to mark out the word "accused" [gesturing to form]. Right here, mark out the word "accused" for me . . . just scratch that b**** out. Yeah. Alright and then initial next to it that way it don't look like I scratched it out . . . . So the difference here between being suspected and accused, I used to ask people but then no one knows what the difference is so I just tell them now because I, I didn't know what the difference was before I started doing this, so – do you know how you become suspected of doing something in the Army?

Appellant responded "Suspected?" The agent said, "Huh?" Appellant repeated, "Did you say 'suspected'?" The agent repeated, "Suspected. How do you become suspected of something in the Army?" Appellant said, "Your actions." The agent responded, "Hmm?" Appellant repeated, "Your actions?" The agent said:

> No [chuckled]. Literally someone just said it. So let's say that you and I, we go over this form, you say "Yes, Agent []." You sign here in block three and say "Yes, Agent [], I'll speak with you today." We talk for however long you want to talk because at that point it'll become completely up to you. Tomorrow you come back, right? The front, push that little buzzer and somebody came and talked to you? You press that button again, and someone comes up again and, "Hey, while I was talking to [the agent] yesterday he punched me in the face." *Now,*

> *I'm suspected of punching you in the face. Everyone knows I probably didn't punch you in the face [chuckles], but I'm suspected of it. Does that make sense?*

(emphasis added). Appellant responded, "Oh, okay, yeah." The agent continued:

> OK, umm, I need you to bear with me with, with this, umm, obviously this is what you're suspected of, rape of a child, do you understand what that is? Umm, do you have any questions about that at all?

Appellant responded, "No." The agent continued:

> So yeah, I just want – we have to put that there because of what's being presented to us by the girl. Once we go through all this I think, if you agree to talk to me, then I can better explain, explain it, okay? Does that make sense? Do you have any questions about that? I know it's crazy to see something like that on paper. Okay.

The agent warned appellant that his statements could be used against him in a criminal trial, and that he had the right to counsel – approximately 26 minutes had passed since he sat down with appellant. He continued:

> If you are now willing to discuss the offense under investigation with or without a lawyer present you have the right to stop answering questions at any time or speak privately with a lawyer before I can ask you anything further even if you sign the waiver below. And I told you that's the most important one because even if you just give me, if you say "Yeah, [agent's first name], I'll talk to you." And you agree to talk to me, you can talk to me for 30 seconds, and then be like "[agent's first name], I want to go home." Then you go home. You can talk to me for two hours, "[agent's first name], I want to go home." You go home. There is not a scenario that can happen where you don't get to go home. Does that make sense, man?

Appellant responded, "Yeah." After some additional dialogue about whether appellant had previously requested a lawyer after being advised of his rights, appellant ultimately signed the rights waiver form.

The agent immediately returned to his previous substantive dialogue with appellant, and appellant confessed meeting the victim on Snapchat and engaging in sexual activity with her.

*B. Pretrial Motion and Ruling*

The defense moved to suppress appellant's confession, citing the fifth Amendment and Article 31, UCMJ. Along with appellant's enlisted record brief, the government offered the agent's transcribed testimony from the original trial. Several excerpts bear repeating:

SVP: I [would] like to first direct your attention to before you gave him the rights advisable [*sic*]. Was there a discussion between you and [appellant] during that time?

Agent: There was.

SVP: What part – what do you categorize that portion of an interview.

Agent: It's categorized as rapport building. It's just a time for me to get to know him and for him to have the opportunity to get to know me.

SVP: And during that time, did you ask him questions about the actual offenses?

Agent: About the offenses specifically, no.

SVP: Matter of fact during that discussion, who was predominantly talking?

Agent: I was, ma'am.

SVP: All right. At one point during that, he asked questions, correct?

Agent: He did.

SVP: And did you signal that you would answer those later?

Agent: I did.

SVP: Why did you do that?

Agent: Because a lot of times when we give anyone who we're speaking with that we're going to give a rights waiver to. When we allow them to ask questions before the rights waiver. Even if we're not answering them, that's going to lead to it. It can kind of go in a way that's going to violate their rights and lead to them saying things that

are going to kind of not protect them as we're supposed to do in those situations.

SVP: So did you have concerns that if you'd provided more information at that time, he would have started talking before he got through the DA 3881?

Agent: Yes.

SVP: Then at some point, you did remind—discussed Snapchat prior to the rights advisal, correct?

Agent: That's correct.

SVP: Why did you discuss Snapchat at that time?

Agent: It was—I was trying to just get his memory working. Especially—when people come in usually they don't know why they're there. Try to give them information as to why they're there just to get their mind moving in case they do want to talk to us. So then the conversation[']s easier at that point.

SVP: When you asked a question as to him having a Snapchat. Were you asking him specifically [as] to the victim in this case?

Agent: No, ma'am, it was just a general question.

SVP: And in general, is there a violation of the UCMJ to talk to a minor on Snapchat?

Agent: Not that I'm aware of, no, ma'am.

SVP: So that wouldn't have required a rights advisal?

Agent: It would not have.

### C. The Military Judge's Ruling

The military judge made a written ruling with findings of fact and conclusions of law. Among other things, he wrote, "CID contacted the accused's command to

have him come in for questioning." The record does not specifically state this fact, but it was a reasonable inference.[3]

The ruling organized the interrogation by "phase," labeling phase one as "[r]apport [b]uilding." As part of this phase, the military judge wrote:

> [The agent] collected administrative data and engaged in small talk. In CID parlance, this was part of the standard "rapport building" phase. Among other things, [the agent]: [] [told appellant] that "there was a girl making allegations against a handful of Soldiers like yourself that we've had to bring in and speak with . . . . We just want to understand what the relationship was with this girl" . . . . [the agent asked appellant], "do you know who that is," to which the [appellant] replied, "yeah, I've got an idea." (footnotes and emphasis omitted).

The military judge continued to describe this phase, including the agent's statement about "perspective," after which he asked appellant, "I don't have any more questions for you for this, do you have any questions for me before we move on, or anything you want to talk about?" The judge found appellant "replied, 'yeah, like, this girl, what did she say, like what is she talking about?'" (emphasis omitted). The agent replied that the victim said she met appellant on Snapchat, and the agent asked appellant whether he had Snapchat, to which appellant responded affirmatively. According to the military judge, appellant also responded affirmatively when the agent asked, "So, do you recall meeting any girls on Snapchat?" Appellant offered two names, though difficult to fully discern on the recording, and he answered, "no," when the agent asked, "Do you remember their user names at all?"

After writing that the agent "conversed in a normal tone of voice" and remained seated, the military judge moved on to describe phase two, "Rights Warning and Waiver." He wrote, "[a]bout 30 minutes into the session, [the agent] transitioned to the rights warning process, stating [among other things]: 'OK, so here's the thing. I can't talk to you . . . so, because we live in America . . . . I'm going to go over with you . . . a rights warning form . . . .'" Ultimately the military judge partially granted and denied the motion, excluding appellant's pre-waiver statements while allowing the government to seek admission of his post-waiver confession.

---

[3] Based on our experience as practitioners, most junior enlisted soldiers do not even know where CID is located on any given Army installation. The agent's indication to appellant that most people do not know what CID is—is consistent with our experience and the military judge's reasonable inference.

## LAW AND DISCUSSION

### *A. Self-Incrimination*

"No person shall be . . . compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. A custodial interrogation must be preceeded by notifications regarding the right to silence, right to counsel, and that any statement may be used against the person making the statement. *Miranda v. Arizona*, 384 U.S. 436, 466-69 (1966).

To be valid, a waiver of Fifth Amendment rights must be voluntary. Military Rule of Evidence [Mil. R. Evid.] 305(e)(1). Voluntariness of a rights waiver and voluntariness of a confession, overall, are two "distinct and 'discrete inquiries.'" *United States v. Mott*, 72 M.J. 319, 330 (C.A.A.F. 2013) (citing *Edwards v. Arizona*, 451 U.S. 477, 484 (1981)). A rights waiver obtained by deception or trickery is involuntary, and thus, invalid. *United States v. Erie*, 29 M.J. 1008, 1012 (A.C.M.R. 1990). An invalid rights waiver renders subsequent admissions inadmissible. *See* UCMJ art. 31(d); *see also* Mil. R. Evid. 304(a) ("If the accused makes a timely motion or objection . . . an involuntary statement from the accused, or any evidence derived therefrom, is inadmissible at trial . . . ."). It is likewise impermissible for law enforcement to "question first," seeking to elicit incriminating responses, and then advise a subject of their rights later. *Missouri v. Seibert*, 542 U.S. 600, 605-06, 611-17 (2004).

"'A servicemember's protection against compulsory self-incrimination is unparalleled in the civilian sector' because '[t]his fundamental right is protected by both the Fifth Amendment *and* Article 31, UCMJ.'" *United States v. Nelson*, 82 M.J. 251, 255 (C.A.A.F. 2022) (quoting *United States v. Mapes*, 59 M.J. 60, 65 (C.A.A.F. 2003)) (alterations and emphasis in original). Of the two, "[t]he protections afforded to servicemembers under Article 31(b), UCMJ, are in many respects broader than the rights afforded to those servicemembers under the Fifth Amendment of the Constitution." *United States v. Evans*, 75 M.J. 302, 303 (C.A.A.F. 2016).

> No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

UCMJ art. 31(b).

> [W]hen an Article 31(b), UCMJ, violation occurs in a particular case, the appropriate test for prejudice depends upon the facts and

circumstances presented. If the . . . violation also implicates the constitutional rights of the accused, then the harmless beyond a reasonable doubt test applies. But if the Article 31(b), UCMJ, violation stands alone as a statutory violation . . . then the nonconstitutional test for prejudice . . . applies.

*Evans*, 75 M.J. at 303. Under that standard, "the test for prejudice is whether the error had a substantial influence on the findings" considering "(1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question." *United States v. Jones*, 85 M.J. 80, 84 (C.A.A.F. 2024) (internal quotations and citations omitted).

### B. Standard of Review

We review a military judge's decision regarding a motion to suppress appellant's statements for an abuse of discretion. *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004) (internal citation omitted). This is more than mere disagreement with a trial judge's ruling. *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010). Instead, an "[a]buse of discretion occurs when the military judge: (1) bases a ruling on findings of fact that are not supported by the evidence; (2) uses incorrect legal principles; (3) applies correct legal principles in a clearly unreasonable way; or (4) does not consider important facts." *United States v. Shelby*, 85 M.J. 292, 294 (C.A.A.F. 2025) (citing *United States v. Commiso*, 76 M.J. 315, 321 (C.A.A.F. 2017)). When conducting our review, we view "'the evidence in the light most favorable to the prevailing party'" from trial. *United States v. Brinkman-Coronel*, __ M.J. __, 2025 CAAF LEXIS 420, *14 (C.A.A.F. 28 May 2025) (quoting *United States v. Eugene*, 78 M.J. 132, 134 (C.A.A.F. 2018)).

The military judge described his ruling as a "close call." Whether we agree with that assessment or not is immaterial, but we observe some significant decisional gaps. Most importantly, his ruling did not address the legally significant difference between voluntariness of waiver and voluntariness of a statement (post-waiver) in general. Based on the common law cited by the military judge, he applied the incorrect legal framework—that is, instead of analyzing whether trickery was used to *obtain* appellant's waiver, he looked to the use of trickery *after* a waiver was obtained. On its own this constituted an abuse of discretion. *Shelby*, 85 M.J. at 294.

The ruling also did not address other important points: whether appellant's interrogation was custodial; that the agent failed to tell him his unwarned and incriminating responses were inadmissible; and, that the agent immediately followed the waiver with interrogation that incorporated appellant's previous unwarned and incriminating responses, yielding additional self-incrimination.

Finally, the ruling did not address an obvious credibility problem raised by the transcript of the agent's previous testimony: among other things, the notion (proposed by the SVP and affirmed by the witness under oath) that he was not asking appellant about the offense under investigation was *incredible* in the strictest sense of that word. We note the government did not call the agent to testify on this interlocutory question on rehearing. This is not a case where we might tend to defer to a military judge's in-court assessment of a witness's credibility; the military judge was reading from the same cold record as we have on appeal.

We review de novo whether an interrogation was custodial. *United States v. Chatfield*, 67 M.J. 432, 437 (C.A.A.F. 2009) (citing *Thompson v. Keohane*, 516 U.S. 99, 112-13 (1995)). Custodial interrogations create compelling pressures on the persons interrogated. *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) ("Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspected to be charged with a crime."). Determining whether an interrogation is custodial in military justice involves an objective analysis of the totality of the circumstances, focusing on whether a reasonable person in the suspect's position would feel free to leave, *United States v. Flanner*, 85 M.J. 163, 170 (C.A.A.F. 2024) (internal citation omitted), and whether a person voluntarily waived their Fifth Amendment and Article 31, UCMJ, rights. *Mott*, 72 M.J. at 330 (citing *Berghuis v. Thompkins*, 560 U.S. 370 (2010)).

Under the circumstances, a reasonable person in appellant's position would have believed his freedom to leave was restricted by law enforcement authority – at the very least until midway through the rights warning, and after he had provided incriminating responses to unwarned questioning. Based on the agent's rendition of rights warnings, a reasonable person would have misunderstood the meaning of being a suspect – the agent's definition and hypothetical example were jointly and severally incorrect and misleading. A reasonable person would also have believed the agent's warning to say that any statements made to law enforcement – including appellant's unwarned statements – were admissible against him in a criminal trial. This advice, too, was fundamentally misleading as it pertained to appellant's unwarned statements, creating the "cat out of the bag" dynamic *Missouri v. Seibert* found unconstitutional. Finally, the agent's suggestion that appellant's decision to waive his rights and speak with him would be "beneficial" was just as misleading. Apart from the agent's deception[4] in obtaining the waiver, we find appellant's Fifth Amendment and Article 31(b), UCMJ, rights were violated, because he was under custodial interrogation and provided incriminating responses to questions without being adequately advised of those rights.

---

[4] The military judge's assessment that the agent did not use deceptive tactics was clearly erroneous.

The military judge erred by denying the motion in part, resulting in prejudice. Appellant's confession was the prosecution's linchpin – at oral argument appellee correctly observed it could not have even charged Specification 2 of The Charge without it – and the government cannot meet its burden to show harmlessness under either the constitutional or non-constitutional prejudice standards.

## CONCLUSION

The findings and sentence are SET ASIDE. A rehearing is ordered on Specifications 1 and 3 of The Charge. Specification 2 of The Charge is DISMISSED.

Judge MORRIS and Judge ARGUELLES concur.

FOR THE COURT:

JAMES W. HERRING, JR.
Clerk of Court